STATE OF NORTH CAROLINA v. EDDIE CARSON ROBINSON

No. 689A84

(Filed 29 August 1990)

1. **Constitutional Law § 31 (NCI3d)— indigent defendant—private psychiatrist at State expense—denial at trial and sentencing—insufficient showing of need**

    The trial court in a capital trial for three murders did not err in the denial of the indigent defendant's pretrial motion for the appointment of a private psychiatrist at State expense to assist in his defense at trial where defendant had previously been examined by a psychiatrist at Dorothea Dix Hospital; defendant made no preliminary showing that his sanity at the time of the offenses would be a significant factor at trial but merely argued that "some type of mental abnormality" must have been present because of the nature of the offenses; and defendant had available the assistance of the psychiatrist who examined him at Dix Hospital. Nor did the court err in failing to appoint a private psychiatrist at State expense to assist defendant in the sentencing phase of the trial where there was no suggestion at the hearing on the pretrial motion that defendant needed any psychiatric assistance beyond that which the Dix Hospital psychiatrist was already prepared to give, and did give, on any issue regarding defendant's mental state that was likely to arise at the sentencing proceeding.

    **Am Jur 2d, Criminal Law §§ 955, 1006.**

2. **Homicide § 20.1 (NCI3d)— first degree murders—crime scene photographs and slides not excessive**

    The trial court did not abuse its discretion in allowing the State to introduce 23 crime scene photographs and slides in defendant's trial for three first degree murders where there was no suggestion that the slide projections were done unfairly, there was no needless repetition of photographs, and the presentation of each photograph or slide was accompanied by competent testimony of witnesses which the photographic or slide evidence illustrated. N.C.G.S. § 8C-1, Rule 403.

    **Am Jur 2d, Homicide §§ 416-419.**

STATE v. ROBINSON

[327 N.C. 346 (1990)]

3. **Jury § 7.11 (NCI3d) — death penalty views — excusal for cause — new sentencing proceeding — harmless error**

Defendant's assignment of error to the excusal for cause of several jurors because of their death penalty views will not be addressed by the Supreme Court where the defendant is being given a new sentencing proceeding since any error in the excusal of such jurors would have affected only the sentencing proceeding.

**Am Jur 2d, Jury § 289.**

4. **Criminal Law § 472 (NCI4th) — display of murder weapon during charge — no gross prosecutorial misconduct — mistrial or instruction not required**

The clerk's placement of an iron pipe used in two murders on the railing of the clerk's table during the court's jury charge, allegedly at the direction of the district attorney, did not constitute gross prosecutorial misconduct requiring the court *ex mero motu* to declare a mistrial or give supplemental jury instructions where the pipe was relevant and admissible evidence which had been introduced by the State as an exhibit and seen by the jury during trial.

**Am Jur 2d, Trial §§ 192, 198.**

5. **Appeal and Error § 331 (NCI4th); Constitutional Law § 28 (NCI3d) — alleged errors in trial transcript — no due process violation**

Defendant's due process rights were not violated by the court reporter's allegedly poor transcription of his trial for three first degree murders where defendant contended that the transcript is replete with incoherent, inconsistent, and senseless language but failed to point to any such significant language in the transcript; there was no indication of efforts to work with either the court reporter or the district attorney to attempt to correct any errors; and there was no suggestion that the transcript could not have been reconstructed if this were truly necessary for a proper understanding of the case on appeal.

**Am Jur 2d, Appeal and Error § 411.**

STATE v. ROBINSON

[327 N.C. 346 (1990)]

6. **Appeal and Error § 155 (NCI4th)— grand jury foreman—racial discrimination—failure to raise issue at trial**

Defendant waived his right to raise on appeal the issue of alleged racial discrimination in the selection of the foreman of the grand jury that indicted him where he made no motion at or before trial challenging any aspect of his indictment. N.C.G.S. § 15A-952(b)(4).

**Am Jur 2d, Appeal and Error § 545; Grand Jury §§ 14, 23.**

7. **Criminal Law § 1352 (NCI4th)— death sentences—McKoy error—harmless error analysis—new sentencing proceeding**

The State failed to demonstrate that the trial court's erroneous instruction requiring unanimity on mitigating circumstances in a capital sentencing proceeding was harmless beyond a reasonable doubt, and three sentences of death imposed on defendant are set aside and the cases are remanded for a new sentencing proceeding, where some evidence was presented at defendant's sentencing proceeding tending to support, in varying degrees, each of five mitigating circumstances submitted to but rejected by the jury, and it cannot be said beyond a reasonable doubt that the erroneous unanimity requirement did not preclude at least one juror from considering one or more of these mitigating circumstances not unanimously found when weighing all circumstances in the ultimate sentencing decision or that no juror would have voted for life imprisonment if proper instructions on the mitigating circumstances had been given.

**Am Jur 2d, Criminal Law §§ 600, 628; Homicide § 513.**

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from three judgments sentencing him to death imposed by *H. Hobgood, J.,* presiding at the 15 October 1984 Criminal Session of Superior Court, BLADEN County. Heard in the Supreme Court on 15 March 1988 and 22 August 1988.

*Lacy H. Thornburg, Attorney General; Elizabeth G. McCrodden, Associate Attorney General; James J. Coman, Senior Deputy Attorney General; William N. Farrell, Jr., Special Deputy Attorney General, and Joan H. Byers, Special Deputy Attorney General, for the State.*

*H. Goldston Womble, Jr. and James R. Melvin for the defendant appellant.*

*E. Ann Christian, Robert E. Zaytoun and John A. Dusenbury, Jr. for North Carolina Academy of Trial Lawyers, amicus curiae.*

EXUM, Chief Justice.

Defendant brings forward several assignments of error and contends he is entitled to a new trial or, alternatively, a new sentencing proceeding. We hold defendant's trial was free from reversible error but that the decision in *McKoy v. North Carolina*, 494 U.S. ---, 108 L. Ed. 2d 369 (1990), entitles him to a new sentencing proceeding.

## I.

Defendant was indicted on 31 May 1984 for the first degree murders of James Elwell Worley, his wife Shelia Denise Worley and her daughter Psoma Wine Baggett. He was tried capitally in the Superior Court, Bladen County, in October 1984 and was found guilty as charged in all three cases.

State's evidence in the guilt phase of the trial tended to show the following: On 26 March 1984 James Elwell Worley was murdered. On 29 April 1984 his wife, Shelia Denise Worley, and her daughter, Psoma Wine Baggett, were both murdered.

After Elton McLaughlin, a boyfriend of Shelia Denise Worley, was taken into custody, the police picked up and interrogated defendant. In a statement to the police defendant provided the following description of James Worley's murder: Defendant met Elton McLaughlin in early March 1984. McLaughlin told defendant he had been hired to kill a young woman's husband and that there would be "some money in it" for defendant's help. Defendant met McLaughlin in late afternoon on 26 March 1984. At approximately 11:30 p.m. they drove to Worley's home, entered through an unlocked back door and found Worley sleeping in bed next to his wife and her child. McLaughlin took a .22 caliber automatic rifle from defendant and fired two shots at James Worley. The victim's wife got out of bed and waited in a hallway with her child while defendant and McLaughlin removed James Worley's body from the house and placed it in the passenger side of Worley's Volkswagen. Defendant drove Worley's car and followed McLaughlin, who was driving his own car, to the Lisbon area of Bladen County where

they parked the cars on the shoulder of the pavement. Defendant removed a jug of gasoline from McLaughlin's car, poured it into the driver's area of the deceased's car and ignited it. Defendant got into McLaughlin's car and McLaughlin drove him home.

Medical evidence indicated Worley died of gunshot wounds to the chest. Two .22 bullets were removed from the body.

In another statement to the police, defendant described Shelia Denise Worley's murder. On 29 April 1984 McLaughlin picked up defendant in Newtown and told him "it was time for Denise to go." Defendant knew this meant it was time to kill Shelia Denise Worley. At McLaughlin's trailer, defendant hid in the master bedroom while Worley and McLaughlin talked. At some point, McLaughlin motioned for defendant to come to the bathroom, where he showed defendant a steel pipe and told defendant to kill Worley with it. McLaughlin returned to Worley and held her with her back to defendant while defendant slipped out of the bathroom and hit her twice in the back of the head with the pipe. Worley fell to the floor and McLaughlin grabbed Worley by the neck, dragged her to the bathroom and held her head underwater in the bathtub for a period of five to ten minutes. After cleaning up the blood, the two men placed the body in the trunk of the victim's car.

Worley's two daughters, four-year-old Psoma and one-year-old Alicia, were then awakened and led to their mother's car. McLaughlin drove to a field and defendant followed in the victim's car with Worley's body in the trunk and her two children inside. At the field McLaughlin told defendant they would have to kill the four-year-old Psoma "because she could talk and identify them." McLaughlin struck the child on the head with the steel pipe twice.

The two men removed the body of Shelia Denise Worley from the trunk and placed it with Psoma in the passenger side of Worley's automobile. Alicia remained in this car. Psoma began to move and defendant struck her once with the pipe. Defendant then drove the automobile to an embankment near a bridge and let it roll into a creek. McLaughlin pulled Worley's body from the passenger side of the car into the water, and he threw Psoma out of the car into the water. As the men left the area, defendant heard Psoma "struggle in the water like she was trying to get help."

STATE v. ROBINSON

[327 N.C. 346 (1990)]

Alicia was recovered the next morning mosquito-bitten and frightened, but otherwise physically unharmed.

Medical evidence indicated Shelia Worley died as a result of "asphyxia from drowning, . . . with a blunt [force] injury to the head as contributing or causing factor." Traces of blood located in the bathroom of the mobile home of McLaughlin and on a towel and vest recovered from the trunk of Worley's car were consistent with the blood type of Worley.

Medical evidence also indicated that Psoma's cause of death was blunt force injuries to the head and drowning.

Defendant offered no evidence.

II.

[1] Defendant assigns as error the trial court's denial of his pretrial motion for the appointment of a psychiatrist to assist in his defense. We find no merit in this assignment.

On 31 May 1984, the same day defendant was indicted, the trial court granted defendant's motion for a psychiatric examination and committed him to Dorothea Dix Hospital to determine his capacity to proceed to trial. Defendant was admitted to Dorothea Dix Hospital on 1 June 1984 and remained there for examination and observation until 15 June 1984. Dr. Lara, a forensic psychiatrist at Dorothea Dix Hospital, examined defendant and filed a report with the court describing him as follows:

> This patient appeared in a conventional grooming, in no major distress with a friendly, appropriate, cooperative attitude. He was engaging, pleasant. His speech was clear. His thought process involved coherent and organized thinking. His mood involved no major distress, but presented him preoccupied and concerned about his legal situation. He presented no evidence of psychosis. His concentration, orientation, and memory were intact. His intellectual functions appeared within an average or dull normal level. His judgment was appropriate. His insight appeared limited. Mr. Robinson demonstrated to be well informed in regards to the nature of his legal situation and the severity of his charges. He denied any history of mental illness, admitted to drinking, and occasional use of marijuana and cocaine. He appeared concerned about his own life and the kind of problems he was involved in.

Defendant scored 82 on an I.Q. test, indicating, according to Dr. Lara, a level of "high borderline intellectual functioning."

Doctor Lara diagnosed unspecified alcohol abuse and a "personality disorder, mixed with dependent, impulsive, and avoidant features." He stated that traits of aggression, apprehensiveness and insecurity were common in persons with defendant's psychological patterns. The report noted defendant's history of alcohol abuse and use of marijuana, cocaine and "injectable drugs."

Doctor Lara found no "evidence of mental illness that could have impaired [defendant's] ability to recognize right from wrong" at the time the crimes were committed. He expressed an opinion that defendant presented "no evidence of psychosis or other severe mental illness," and recommended defendant be discharged for the purposes of proceeding to trial.

On 3 August 1984 defendant moved that he be examined by a private psychiatrist at state expense to determine defendant's mental competence to stand trial. The written motion asserted defendant was indigent and claimed "the alleged facts surrounding the murders of the decedents raise a strong inference that the person or persons who committed these acts was at that time suffering from some sort of mental disease or disability." The motion stated it was necessary to examine defendant again to determine whether he was insane at the time he committed the acts, and it referred to Dr. Lara's report indicating defendant's I.Q. of 82, his history of alcohol and drug abuse and his traits of apprehensiveness and insecurity common in persons similar to defendant.

At the 6 August 1984 Criminal Session of Superior Court, Bladen County, defense counsel, relying essentially on Dr. Lara's report, orally presented this motion to the court. He argued that defendant's I.Q., his "involvement with drugs, alcohol and injectable drugs," the traits of apprehensiveness and insecurity mentioned in Dr. Lara's report and "the very nature of the offenses with which [defendant] is charged . . . indicate that there was some type of mental abnormality present . . . when the acts took place." The trial court reviewed Dr. Lara's report and denied defendant's motion.

Assigning error to this ruling, defendant relies on *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53 (1985), and *State v. Gambrell*,

318 N.C. 249, 347 S.E.2d 390 (1986). *Ake*, followed in *Gambrell*, held that when a defendant makes "a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue, if the defendant cannot otherwise afford one." *Ake*, 470 U.S. at 74, 84 L. Ed. 2d at 60.

> In determining whether defendant has made the threshold show-ing required by *Ake*, the trial court should consider all the facts and circumstances known to it at the time the motion for psychiatric assistance is made. . . . The question under *Ake* is not whether defendant has made a *prima facie* showing of legal insanity. The question is whether, under all the facts and circumstances known to the court at the time the motion for psychiatric assistance is made, defendant has demonstrated that his sanity when the offense was committed will likely be at trial a significant factor.

*Gambrell*, 318 N.C. at 256, 347 S.E.2d at 394. In both *Ake* and *Gambrell* the courts concluded defendants had made the requisite preliminary showing; consequently, in those cases defendants were entitled under the federal Constitution to state-furnished psychiatric assistance.

Defendant here made no preliminary showing that his sanity at the time of the offense would be a significant factor at trial. In support of his motion for state-furnished psychiatric assistance he relied essentially on the report of Dr. Lara. Not only does this report fail to show that defendant's sanity at the time of the offense would be a factor at his trial, it affirmatively indicates that his sanity would not be such a factor. Nor in oral argument on the motion did defendant, through counsel, suggest he would interpose insanity as a defense to the charges against him. He merely referred to "some type of mental abnormality" which he argued must have been present because of the nature of the of-fenses committed. This showing at the hearing on the motion, as any cursory comparison of the facts will reveal, falls far short of the preliminary showing required by and found to have been made in *Ake* and *Gambrell*.

*Ake* also held that in a capital trial where the state offered psychiatric evidence of defendant's future dangerousness at the sentencing phase, defendant "was entitled to the assistance of a psychiatrist on this issue and . . . denial of that assistance deprived

him of due process." *Ake*, 470 U.S. at 86-87, 84 L. Ed. 2d at 68. In *Gambrell* we characterized this aspect of *Ake*, perhaps over-broadly, as meaning "that an indigent defendant is entitled to state furnished psychiatric assistance on issues relating to his mental state which may arise at a capital sentencing hearing." *Gambrell*, 318 N.C. at 256, n.2, 347 S.E.2d at 394, n.2. We have read both aspects of the *Ake* decision to be consistent with holdings of this Court that to be entitled to the assistance of an expert at state expense an indigent defendant must show "a particularized need" for the expert. *State v. Smith*, 320 N.C. 404, 358 S.E.2d 329 (1987) (applying *Ake* to defendant's request for a psychiatric expert to assist at the sentencing phase of a capital case); *State v. Penly*, 318 N.C. 30, 347 S.E.2d 783 (1986) (applying *Ake* to the guilt phase of a capital case).

Relying on *Ake*'s application to the sentencing phase of a capital case, defendant argues in his brief that it was error to deny his pretrial motion because a "private psychiatrist would have in all probability assisted the defendant in his being given more consideration regarding the mitigating circumstances surrounding mental or emotional disturbance and his susceptibility of acting under the domination of . . . McLaughlin" by the jury at his sentencing proceeding.

This argument must also fail. There is no suggestion in defendant's showing at the hearing on his pretrial motion that he needed any psychiatric assistance beyond that which Dr. Lara was already prepared to give, and did give, on any issue regarding defendant's mental state that was likely to arise at the sentencing proceeding. *See State v. Smith*, 320 N.C. 404, 358 S.E.2d 329 (1987).

As a matter of state procedural law an indigent defendant is entitled to the assistance of state-furnished experts, including medical experts, only upon a showing "that there is a reasonable likelihood that it will materially assist the defendant in the preparation of his defense or that without such help it is probable that defendant will not receive a fair trial." *State v. Gray*, 292 N.C. 270, 278, 233 S.E.2d 905, 911 (1977) (interpreting N.C.G.S. § 7A-450(b) ); *see also State v. Gardner*, 311 N.C. 489, 319 S.E.2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985); *State v. Craig*, 308 N.C. 446, 302 S.E.2d 740, *cert. denied*, 464 U.S. 908, 78 L. Ed. 2d 247 (1983). Making such a determination depends upon

the facts and circumstances of each case and rests, finally, in the trial judge's discretion. *Id.*

Because of the vagueness of defendant's showing at the hearing on his pretrial motion regarding his need for a psychiatric expert in addition to Dr. Lara and because he had available the assistance of Dr. Lara, the denial of his motion as a matter of state procedural law was well within the discretion of the trial judge and constitutes no error.

## III.

[2] Defendant next argues the trial court erred in allowing the State to introduce, over defendant's objections, twenty-three "crime-scene" photographs and slides.

State's Exhibits Nos. 1-9 depict various aspects of James Worley's murder. Exhibits 1 and 2 showed different photographs of James Worley's car and illustrated testimony given by the witness who first discovered the burned car containing the victim. Exhibits 3 and 4 showed the body of James Worley as it was found in the automobile and illustrated the testimony of Special Agent Michael Lowder who investigated the crime scene. Photographs depicting various aspects of Worley's body were introduced as Exhibits 5 through 11 and illustrated the testimony of Dr. Radische, who performed the autopsy on Worley and established Worley's cause of death.

Exhibits 15 through 18 were photographs of Shelia Denise Worley's car as it was found partially submerged in a creek, and of the locations of the victims' bodies after they were recovered from the creek. These illustrated the testimony of Kent Allen, a witness who testified about his discovery of the bodies. Exhibits 20 through 23 were photographic slides in color of Shelia Denise Worley's body and illustrated the testimony of Dr. John Butts, the pathologist who performed that autopsy. Exhibits 25 through 30 were slides of Psoma Baggett's autopsy and illustrated the testimony of Dr. Radische, who also performed that autopsy.

Defendant argues these photographs and slides should have been excluded under Rule 403 of the North Carolina Rules of Evidence, which provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair preju-

dice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C.G.S. § 8C-1, Rule 403 (1986). Defendant contends the photographs and slides were unfairly prejudicial and that this prejudice outweighed their relevancy.

The issue of admitting at trial photographic evidence with inflammatory potential was exhaustively reviewed by this Court recently in *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988). We said:

> "Unfair prejudice" means an undue tendency to suggest a decision on an improper basis, usually an emotional one. *State v. Mason*, 315 N.C. 724, 340 S.E.2d 430 (1986). Photographs are usually competent to explain or illustrate anything that is competent for a witness to describe in words, *State v. Holden*, 321 N.C. 125, 362 S.E.2d 513 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988), and properly authenticated photographs of a homicide victim may be introduced into evidence under the trial court's instructions that their use is to be limited to illustrating the witness's testimony. *Id.*, *State v. Watson*, 310 N.C. 384, 312 S.E.2d 448 (1984). Thus, photographs of the victim's body may be used to illustrate testimony as to the cause of death, *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). Photographs may also be introduced in a murder trial to illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree, *State v. Lester*, 294 N.C. 220, 240 S.E.2d 391 (1978), and for this reason such evidence is not precluded by a defendant's stipulation as to the cause of death. *State v. Elkerson*, 304 N.C. 658, 285 S.E.2d 784 (1982). Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury. *State v. Murphy*, 321 N.C. 738, 365 S.E.2d 615 (1988); *State v. King*, 299 N.C. 707, 264 S.E.2d 40 (1980).

> This Court has recognized, however, that when the use of the photographs that have inflammatory potential is ex-

**STATE v. ROBINSON**

[327 N.C. 346 (1990)]

cessive or repetitious, the probative value of such evidence is eclipsed by its tendency to prejudice the jury.

. . . .

In general, the exclusion of evidence under the balancing test of Rule 403 of the North Carolina Rules of Evidence is within the trial court's sound discretion. *State v. McLaughlin*, 323 N.C. 68, 372 S.E.2d 49 (1988); *State v. Mason*, 315 N.C. 724, 340 S.E.2d 430 [1986]. Whether the use of photographic evidence is more probative than prejudicial and what constitutes an excessive number of photographs in light of the illustrative value of each likewise lies within the discretion of the trial court. *State v. Sledge*, 297 N.C. 227, 254 S.E.2d 579 [1979]. Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision. *State v. Parker*, 315 N.C. 249, 337 S.E.2d 497 (1985).

The test for excess is not formulaic: there is no bright line indicating at what point the number of crime scene or autopsy photographs becomes too great. The trial court's task is rather to examine both the content and the manner in which photographic evidence is used and to scrutinize the totality of circumstances composing that presentation. What a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, the scope and clarity of the testimony it accompanies—these are all factors the trial court must examine in determining the illustrative value of photographic evidence and in weighing its use by the state against its tendency to prejudice the jury.

*State v. Hennis*, 323 N.C. at 283-85, 372 S.E.2d at 526-27.

This Court has rarely held the use of photographic evidence to be unfairly prejudicial, and the case presently before us is distinguishable from the few cases in which we have so held. In *Hennis* we found error in permitting repetitious photographic evidence portraying autopsies performed upon the mutilated bodies of a mother and two of her children. In that case twenty-six slides were introduced and projected in the courtroom directly over defendant upon an unusually large screen accommodating two images three feet, ten inches by five feet, six inches, side by side. This

STATE v. ROBINSON

[327 N.C. 346 (1990)]

presentation was followed by the distribution of thirty-five eight-by ten-inch glossy photographs, most in color, to jurors one at a time for an hour.

In *State v. Mercer*, 275 N.C. 108, 121, 165 S.E.2d 328, 337 (1969), *overruled on other grounds, State v. Caddell*, 287 N.C. 266, 215 S.E.2d 348 (1975), we held photographs taken in a funeral home of the victim's body were "poignant and inflammatory" and should not have been admitted where the evidence tended to show the victim had been lying on a bed when shot and the evidence as to cause of death was uncontroverted.

While some of the photographic evidence at issue here is gruesome, there is no suggestion the slide projections were done unfairly, there was no needless repetition of photographs and the presentation of each photograph or slide was accompanied by competent testimony of witnesses, which the photographic evidence illustrated. In *State v. Dollar*, 292 N.C. 344, 233 S.E.2d 521 (1977), we recognize it is

> well settled that the mere fact that a photograph is gruesome, revolting or horrible does not prevent its use by a witness to illustrate his testimony. Nevertheless, an excessive number of such photographs may not properly be admitted in evidence. What constitutes an excessive number of photographs must be left largely to the discretion of the trial court in the light of their respective illustrative values. The photographs in the present case are not merely repetitious. They portrayed somewhat different scenes and we find in the use of the total number no abuse of discretion.

*Id.* at 354-55, 233 S.E.2d at 527 (citations omitted).

So it is here. Considering all the circumstances pertaining to the photographic evidence, we conclude the trial court did not abuse its discretion in permitting the photographic evidence to be used as it was.

IV.

[3] Defendant assigns error to the excusal for cause of several jurors because of their views concerning the death penalty. He contends the jurors were improperly excused under *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985). Even if these jurors

**STATE v. ROBINSON**

[327 N.C. 346 (1990)]

had been improperly excused because of their death penalty views, the error would have affected only the sentencing proceeding. Since defendant is being given a new sentencing proceeding, we deem it unnecessary to address this assignment of error. Suffice it to say that we have carefully examined the record regarding each excusal complained of by defendant and find that each was altogether proper.

V.

[4] Defendant also argues the trial court erred in failing to declare a mistrial because of alleged prosecutorial misconduct during the court's instructions to the jury before verdict deliberations. We find no error.

After the jury retired defense counsel requested the record reflect "that the court clerk, Ms. Simmons, at the direction of the District Attorney this morning when we came in for the jury charge, had State's Exhibit Number 44, I believe, the iron pipe" used to strike Shelia Denise Worley and her daughter, placed on a railing atop the clerk's table "in full view of the jury . . . right where they would walk by that on their way out." Defendant claimed the pipe's proximity to the jury "sent a message," and asked that the record reflect the contention that the District Attorney acted improperly. The trial court ordered the pipe to be moved out of sight, and defense counsel thanked the court.

Defendant contends on appeal the trial court should have *ex mero motu* declared a mistrial or at least given supplemental jury instructions to mitigate the prejudicial effect of the pipe's placement. We disagree.

The decision whether to order a mistrial lies within the discretion of the trial judge, to be exercised upon the happening of some prejudicial event rendering a fair and impartial trial impossible. *State v. McLaughlin*, 323 N.C. 68, 96, 372 S.E.2d 49, 68 (1988), *cert. granted and judgment vacated*, --- U.S. ---, 108 L. Ed. 2d 601 (1990); *State v. Crocker*, 239 N.C. 446, 80 S.E.2d 243 (1954). Our review of a trial court's decision not to intervene *ex mero motu* to correct an alleged impropriety concerning the prosecutor's closing argument not objected to at trial is limited to determining whether the complained-of conduct was so grossly improper that the trial court abused its discretion in failing to intervene. *State v. Allen*, 323 N.C. 208, 372 S.E.2d 855 (1988).

We find no abuse of discretion here. No request for supplemental instructions or motion for mistrial was made. The pipe was relevant and admissible evidence, *see State v. Joyner*, 301 N.C. 18, 269 S.E.2d 125 (1980), was introduced by the State as an exhibit, and was seen by the jury during trial. The placement of the pipe on the railing of the clerk's table fails to amount to conduct so grossly improper as to say the trial court abused its discretion in failing on its own motion to intervene or declare a mistrial.

## VI.

[5]  Defendant next argues he has been prejudiced by and assigns error to the court reporter's allegedly poor transcription of trial proceedings. He contends the transcript, encompassing eight volumes, is replete with "incoherent, inconsistent, and sometimes totally senseless language." Defendant argues, due to the seriousness of defendant's sentence and the frequency of errors in the transcript, he has been effectively denied due process of law as required by the fifth amendment of the United States Constitution and Article I, Section 19 of the North Carolina Constitution.

A certified record imports verity, and this Court is bound by it. *See State v. Sanders*, 312 N.C. 318, 319, 321 S.E.2d 836, 837 (1984) (per curiam) (and cases cited therein). Defense counsel and the district attorney, as officers of the court, have an equal duty to see that reporting errors in the transcript are corrected. *State v. Fields*, 279 N.C. 460, 183 S.E.2d 666 (1971). This duty does not, however, embrace the right to perpetuate and then take advantage of transcript mistakes. *Id.*

In *Sanders* this Court remanded a capital case for a new trial because the transcript was an altogether inaccurate and inadequate transcription of the trial proceedings and no adequate record of what transpired at trial could be reconstructed. Several significant factors led to this decision. First, the defendant reproduced specific portions of the trial judge's instructions to the jury which clearly had been erroneously transcribed by the court reporter. Second, counsel for the State and the defendant diligently attempted to correct the problem, but were unable to do so. Last, the original court reporter responsible for the transcript was no longer available to the parties. *Id.* at 319-20, 321 S.E.2d at 837.

The instant case is easily distinguished from *Sanders*. Defendant fails to point to any significantly incoherent, inconsistent or

senseless language in the transcript. Assuming there were errors, there is no indication of efforts to work with either the court reporter or the district attorney to attempt to correct them; nor is there any suggestion that the transcript could not have been reconstructed if this were truly necessary for a proper understanding of the case on appeal.

This assignment of error is overruled.

## VII.

[6] Defendant also claims, by way of an addendum to the Record on Appeal, that he was denied constitutionally protected rights because of alleged racial discrimination in the selection of the foreman to the grand jury that indicted him.

In North Carolina one member of each impaneled grand jury is chosen by the presiding superior court judge to serve as foreman. N.C.G.S. § 15A-622(e). In *State v. Cofield*, 320 N.C. 297, 357 S.E.2d 622 (1987), we held racial discrimination against black persons in the selection of the grand jury foreman denies a black defendant the protections of Article I, section 19 and Article I, section 26 of the Constitution of North Carolina as well as the equal protection clause of the fourteenth amendment to the federal Constitution and vitiates the proceeding against the defendant.

The defendant in *Cofield* raised the issue by moving before trial to dismiss his indictment. Here defendant made no motion at or before trial challenging any aspect of his indictment. He raised the issue for the first time on appeal. Defendant has thus waived his right to make this challenge to the grand jury which indicted him. N.C.G.S. §§ 15A-952(b)(4).[1]

## VIII.

[7] Defendant contends and we agree that he is entitled to a new sentencing proceeding under *McKoy v. North Carolina*, 494 U.S. ---, 108 L. Ed. 2d 369 (1990). *See also State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426 (1990).

---

1. Such waiver, except for failure to move for dismissal for improper venue, is subject to the trial judge's power to grant relief. N.C.G.S. § 15A-952(e). Defendant here never afforded the trial judge opportunity to exercise this power. Assuming without deciding that this statutory power also resides in this Court, we decline to exercise it.

STATE v. ROBINSON

[327 N.C. 346 (1990)]

After defendant's sentencing proceeding the jury found the presence of two aggravating circumstances in the murder of James Elwell Worley: Defendant had been previously convicted of a felony involving violence to another person, and the murder was committed for pecuniary gain. Three aggravating circumstances were found in the murders of Shelia Denise Worley and Psoma Wine Baggett: Defendant had been previously convicted of a felony involving violence to another, each murder was committed for the purpose of avoiding arrest, and each murder was part of a course of conduct by defendant that included crimes of violence inflicted on others.

The jury's findings of mitigating circumstances in each of the three murders were virtually identical: In all three defendant was found to have testified truthfully on behalf of the State in another felony prosecution; voluntarily acknowledged wrongdoing at an early stage of the criminal process; and voluntarily confessed to the crimes after being warned of his right to remain silent and without requesting the assistance of counsel. In the murder of Shelia Denise Worley the jury found her participation in defendant's murder of James Worley to be a mitigating circumstance. In all three murder convictions the jury considered and rejected five submitted mitigating circumstances: The murders were committed while defendant was under the influence of mental or emotional disturbance; the murders were actually committed by another and defendant served only as an accomplice with minor participation; defendant acted under the domination of another; his mental or emotional development was significantly below normal in that his I.Q. was 82, and he was remorseful for the crimes. In all three cases the jury failed to find the existence of any unspecified circumstances arising from the evidence and deemed to have mitigating value.

In all three cases the jury determined the mitigating circumstances were insufficient to outweigh the aggravating circumstances and these aggravating circumstances, when considered with the mitigating circumstances, were sufficiently substantial to warrant the death penalty. The jury recommended defendant be sentenced to death for the three murder convictions, and the trial court entered judgments accordingly.

The United States Supreme Court held unconstitutional under the federal Constitution the portion of North Carolina's capital sentencing instructions which require the jury unanimously to find the existence of a mitigating circumstance before that circumstance,

and, in effect, evidence in support of it can be considered by any juror when determining the ultimate recommendation as to punishment. Such a requirement was deemed constitutionally infirm because it "prevent[ed] the sentencer from considering all mitigating evidence" in violation of the eighth and fourteenth amendments. *McKoy*, 494 U.S. at ---, 108 L. Ed. 2d at 376.

The instructions and verdict sheet at defendant's trial contained *McKoy* error. Both required the jury to find each mitigating circumstance unanimously before any juror could consider that circumstance favorably to defendant in the ultimate sentencing decision. Defendant is therefore entitled to a new sentencing proceeding unless the error was harmless. *State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426.

The State must demonstrate constitutional error to be harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443. Here the State has failed to meet this burden. Mitigating circumstances submitted to but rejected by the jury included the following: defendant was under the influence of mental or emotional disturbance; his role in the murders was that of a minor accomplice; he acted under the domination of Elton McLaughlin; his mental or emotional development was significantly below normal and he was remorseful for the crimes committed.

At defendant's sentencing proceeding some evidence tending to support, in varying degrees, each of these mitigating circumstances was presented. Defendant testified at the sentencing proceeding that he was following the instructions of McLaughlin and was carrying out McLaughlin's plan to murder the victims. When asked if he wanted to say anything to the court or to Shelia Denise Worley's mother, defendant responded:

> Yes, I would like to say to the court and Ms. Washington at this time that I am truly sorry for the participation that I had in this and if there was some way that I could make things straight I would.

Defendant also presented the expert testimony of Dr. Patricio Lara, a forensic psychiatrist at Dorothea Dix Hospital. Doctor Lara testified defendant's I.Q. was 82, "approximately in the middle range between the highest mental retardation score and the lowest average." The doctor testified he diagnosed defendant as suffering from both alcohol abuse and a personality disorder.

We cannot say beyond a reasonable doubt that the erroneous unanimity requirement did not preclude at least one juror from considering one or more of these mitigating circumstances not unanimously found when weighing all circumstances in the ultimate sentencing decision. Neither can we say beyond a reasonable doubt that no juror would have voted for life imprisonment rather than the death penalty if proper instructions on the mitigating circumstances had been given. *See State v. Brown*, 327 N.C. 1, 394 S.E.2d 434 (1990). We, therefore, remand this case for a new sentencing proceeding in all cases.

Remanded for new sentencing proceeding.