STATE OF NORTH CAROLINA v. LINDA MOONEY SMITH

No. COA98-1623

(Filed 7 December 1999)

## 1. Jury— selection—death penalty—rehabilitation

The trial court did not abuse its discretion in a capital murder prosecution by refusing to allow defendant to rehabilitate jurors excused for cause based on their views of the death penalty where they had made their opposition clear. Absent a showing that further questioning would have elicited different answers, the court does not err by refusing to permit defendant to ask about the same matter. Moreover, the defendant here was convicted of second-degree murder.

## 2. Evidence— cross-examination—door opened

The trial court did not err in a murder prosecution where defendant contended that the court had permitted speculative testimony, but all of the evidence was either within the personal knowledge of the witness or was permitted due to defendant having opened the door on cross-examination.

## 3. Evidence— leading questions—directing witness's attention

The trial court did not abuse its discretion in a murder prosecution by allowing the district attorney to ask leading questions where the case was long and complicated and the questions either were "bridges" or summaries of testimony or were directing the attention of the witness to earlier statements.

## 4. Evidence— cross-examination—questions proper

The trial court did not err in a murder prosecution by not allowing defendant to ask certain questions on cross-examination where the questions had already been answered, were irrelevant, were confusing or argumentative, lacked sufficient basis, or incorrectly summarized the witness's testimony.

## 5. Evidence— hearsay—not offered to prove the truth of the matter asserted

There was no error in a murder prosecution where most of the statements objected to by defendant as hearsay explained subsequent conduct or corroborated prior testimony and so were not offered to prove the truth of the matter asserted. Additionally, the trial court gave a limiting instruction.

**6. Evidence— regular course of business—officer's dispatch time**

There was no error in a murder prosecution where defendant objected to an officer's testimony that the time on his dispatch computer was accurate. Although the State did not quite lay a proper foundation, the error was harmless; furthermore, defendant offered the same information during the officer's cross-examination.

**7. Evidence— admission of party opponent—admissible**

The trial court did not err in a murder prosecution by admitting defendant's statement to police, which contained remarks defendant attributed to the victim. Defendant's statement was an admission of a party opponent and the remarks by the victim were not spoken or offered to prove the truth of the matter asserted.

**8. Evidence— time line—accuracy**

There was no prejudice in a murder prosecution where defendant argued that a time line used by the prosecution was inaccurate but the facts listed on the time line were verified by each witness as that witness testified and defendant failed to show that "inaccuracies" were in any way prejudicial. Small changes in the way a phrase was written as compared to the way the witness spoke the phrase did not alter the substance.

**9. Evidence— inculpatory statement—newspaper publication—no prejudice**

There was no prejudice in a murder prosecution where the court held a voir dire concerning a statement by defendant to an aunt that she had heard that this was a mercy killing, the court decided to allow the statement, and a local newspaper published the details of the hearing before the statement was admitted. Assuming that the statement was inculpatory, there was no basis to think that the jury became aware of its publication in the local newspaper and it was subsequently admitted into evidence.

**10. Discovery— sanctions—witnesses recalled—no abuse of discretion**

There was no abuse of discretion in a murder prosecution where the State did not divulge a statement by defendant before the trial; the court noted that defendant was in possession of the statement for at least four days prior to its introduction; and,

STATE v. SMITH

[135 N.C. App. 649 (1999)]

rather than granting a mistrial, the court ordered all witnesses who had testified to be recalled for further examination. There was no showing that the late revelation upset defendant's trial strategy or that she was otherwise prejudiced.

## 11. Evidence— photographs—murder victim

The trial court did not abuse its discretion in a murder prosecution by admitting two photographs of the victim's tongue after it had been removed from her head and sliced in half. The photographs were relevant to the cause of death and the probative value outweighed any prejudicial effect.

## 12. Criminal Law— prosecutor's closing argument—defendant's appearance and demeanor

The trial court did not err in a murder prosecution by allowing the prosecutor to argue in closing that defendant had big hands, was left-handed, was strong, and failed to react with tears for her murdered grandmother. All of the prosecutor's remarks were related to matters observable in the courtroom and, despite defendant's contention, calling attention to defendant's demeanor and appearance did not infringe upon her right not to testify because they were not directed at her failure to take the stand.

Appeal by defendant from judgment entered 17 December 1997 by Judge Thomas W. Seay, Jr. in Superior Court, Rowan County. Heard in the Court of Appeals 21 October 1999.

*Michael F. Easley, Attorney General, by Joan Herre Erwin, Assistant Attorney General, for the State.*

*Davis Law Firm, by James A. Davis, for the defendant.*

WYNN, Judge.

Before her death, Ina Mooney, the 81-year old grandmother of defendant Linda Mooney Smith, resided at the Brian Center Nursing Home. She suffered from Alzheimer's Disease and many other medical conditions including incontinence for which she wore adult diapers. To prevent wandering, the Brian Center staff strapped her into bed each night with a "roll belt," a device which tied around her abdomen and to the sides of the bed.

On 11 February 1997, Ms. Smith visited her grandmother at the Brian Center. But Mrs. Mooney did not recognize her, prompting Ms. Smith to yell at her. And when Ms. Smith tried to take her grand-

STATE v. SMITH

[135 N.C. App. 649 (1999)]

mother back to her room, Mrs. Mooney resisted until a nurse came to their assistance. Ms. Smith again yelled at her grandmother for cooperating with the staff but not with her.

Later while Ms. Smith fed her grandmother, staff members overheard her say "Shut your damn mouth. I want you to eat this. Eat this pudding or I'll shove it down your damn throat." The conversation stopped when the two employees entered Mrs. Mooney's room. Later, another employee heard Ms. Smith tell her grandmother to "Open your damn mouth and eat this damn food," and then saw Ms. Smith grab Mrs. Mooney by the collar and jerk her back and forth in her wheelchair. Ms. Smith left the Brian Center at about 5:30 pm and returned at about 8:30 pm.

Around this time, the staff dressed Mrs. Mooney for bed in a nightgown and an adult diaper called a "promise pad." Since Mrs. Mooney would not stand up straight while the staff dressed her, the connecting tape on the promise pad was askew. The staff then put Mrs. Mooney into bed and attached the roll belt, which was clean from a recent wash. There were no bruises on her face. After the nurses left, Ms. Smith stayed with her grandmother, sitting in the geri-chair next to the bed.

At around 11:15 pm, Nurse Akon Eyo went into Mrs. Mooney's room where she found her alive and awake. Ms. Smith was still in the geri-chair. The nurse left to attend to another patient.

Around midnight, staff member Alice Henderson went to Mrs. Mooney's room to change the promise pad but Ms. Smith told her that she had already changed the promise pad because Mrs. Mooney had a bowel movement. The room was dark and the bed curtain was closed. Ms. Henderson could not see Mrs. Mooney clearly—she could only see that Mrs. Mooney's head was not on the pillow, but was propped up against the headboard.

Ms. Smith left the room at about 12:05 am. On her way out, she told some other Brian Center employees that Mrs. Mooney was awake, talking, and laughing. A few minutes later, an alarm went off, signaling that someone had opened an outside door. Ms. Smith appeared and said that she had propped the door open while she had gone out to smoke and move her car. She also stated that she had seen four teenagers looking into the windows of the Brian Center. The Center called the police, but they found no trespassers. In the meantime, Ms. Smith returned to her grandmother's room.

STATE v. SMITH

[135 N.C. App. 649 (1999)]

Almost immediately, Ms. Smith came out of the room, covering her face with her hands and shaking. The staff members hurried in the room and found Mrs. Mooney dead. Her hair was messed up, her face was bruised, and blood came out of her ears and pooled under her eyes. The pillow was propped behind Mrs. Mooney's head, and her blood was smeared on the roll belt, which was loose on the side of the bed near where Ms. Smith had been sitting. The promise pad was still in place, and the nurses noted that its tape was askew, indicating that it was the same pad they had put on Mrs. Mooney themselves—not a new clean pad. In fact, no soiled pads were found in the room, despite Ms. Smith's claim that she had changed a dirty pad.

An autopsy revealed that Mrs. Mooney had died from asphyxiation. The bruising on her face was petechia—burst blood vessels—which create spots which are generally associated with asphyxiation deaths. Several areas on Mrs. Mooney's nose, right cheek, and chin did not have petechia—a phenomenon consistent with pressure being applied at those points. Her tongue and the area behind her ear were bruised. The bruising to the tongue was consistent with an object being crammed into Mrs. Mooney's mouth to stop the airway. The pathologist ruled out death by natural means, and opined that the victim was suffocated, choked and strangled, and one of those means or their combination resulted in her death.

Within days of Mrs. Mooney's death, Ms. Smith stated to her aunt that, "I heard that it was a mercy killing, but there is no mercy to it because I don't believe in God. They say grandma's happy now, but I know that's not true because they will put her in the ground and the worms will eat her."

Ms. Smith was charged and tried for capital murder. A jury found her guilty of second degree murder and the court sentenced her to a term of not less than 189 months nor more than 236 months. She timely filed this appeal.

I.

[1] Ms. Smith first contends that the trial court erred by denying her motion to rehabilitate jurors excused for cause based on their views of the death penalty. We disagree.

As a general matter, a trial judge may not automatically deny the defendant's request for an opportunity to rehabilitate jurors. *See State v. Brogden*, 334 N.C. 39, 430 S.E. 905 (1993). However, "where the record shows the challenge is supported by the prospective juror's

answers to the prosecutor's and court's questions, absent a showing that further questioning would have elicited different answers, the court does not err by refusing to permit the defendant to propound questions about the same matter." *State v. Gibbs*, 335 N.C. 1, 35, 436 S.E.2d 321, 340 (1993), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881 (1994).

After reviewing the record, we find that every prospective juror who was dismissed had made their opposition to the death penalty clear. The trial judge did not abuse his discretion by not allowing Ms. Smith to rehabilitate prospective jurors.

In any case, any error as to this point is harmless since Ms. Smith was convicted of second degree murder and therefore did not face the death penalty. Issues concerning "death qualification" go only to sentencing when the penalty is death. *See State v. Robinson*, 327 N.C. 346, 359, 395 S.E.2d 402, 409 (1990). Furthermore, both the United States Supreme Court and the Supreme Court of North Carolina have rejected the assertion that death qualification results in an unfair trial or a partial jury. *See State v. Wingard*, 317 N.C. 590, 346 S.E.2d 639 (1986); *State v. Avery*, 299 N.C. 126, 261 S.E.2d 803 (1980); *Lockhart v. McCree*, 476 U.S. 162, 90 L. Ed. 2d 137 (1986).

II.

**[2]** Ms. Smith next argues that the trial court erred by permitting various witnesses to offer a variety of speculative testimony. We disagree.

A witness must testify to matters within his personal knowledge. N.C.R. Evid. 602 (1992). However, when a defendant "opens the door" on cross-examination by asking certain questions, testimony that might otherwise be inadmissible is allowed. *See State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984).

In this case, all of the evidence challenged by the defendant was either within the personal knowledge of the witness or was permitted due to Ms. Smith having opened the door to the subject on cross-examination.

For instance, Ms. Smith complains about testimony given by Lisa Hodge on re-direct examination concerning chart notations made by Nurse Durette. However, Ms. Smith herself first asked Ms. Hodge about the notations, opening the door for the prosecutor's follow-up questions.

Ms. Smith also objects to Alice Henderson's testimony in which she guessed the thoughts of Mary Onwuroh when she said "I can't believe that is a family member." Ms. Onwuroh had already testified as to this incident. Ms. Henderson's speculation about the comment merely confirmed what Ms. Onwuroh had stated—that she was surprised to hear a family member speaking in harsh tones to a patient.

Finally, Ms. Smith complains that Nurse Durette was allowed to testify that she was not sure, but she thought that Nurse Eyo said to her that Mrs. Mooney was awake at 11:00 pm. This evidence simply corroborated Ms. Eyo's earlier testimony, and in fact, the trial judge gave instructions to the jury that it was to be used *only* to corroborate Ms. Eyo's testimony. Under these circumstances, Nurse Durette's uncertainty would only have served to dilute the corroborative effect and therefore help the defendant.

### III.

**[3]** Ms. Smith next argues that the trial court erred in allowing the district attorney to ask leading questions to multiple witnesses. We disagree.

Leading questions should not be used on direct examination of a witness except as necessary to develop his testimony. N.C.R. Evid. 611(c) (1992). A leading question is one which, by its form or substance, suggests the answer. While leading questions ordinarily should not be allowed, the trial court has discretion to permit some leading questions, and we will reverse a ruling on the admissibility of a leading question only upon a showing of abuse of discretion. *See State v. Riddick*, 315 N.C. 749, 340 S.E.2d 55 (1986).

In this case, there is no showing that the trial judge abused his discretion. The record shows that the questions that Ms. Smith objected to during trial were not so much "leading" as they were "bridges" or summaries of testimony. In general, the questions did not suggest a particular answer. The few questions that bordered on suggestion did so only to direct the attention of the witness to earlier statements. In any case, the responses went beyond a mere agreement with the question asked, but instead gave a reasoned explanation. As Ms. Smith recognizes, this case was long and complicated. Several witnesses testified to a variety of topics. Allowing the prosecutor to direct the witness's attention to a certain topic through the use of leading questions was not an abuse of discretion.

IV.

**[4]** Ms. Smith next argues that the trial court erred by not allowing her to ask nine different witnesses a variety of questions on cross-examination. We disagree.

Ms. Smith's arguments on this point are numerous; but, since we find no error in the trial court's rulings, we dismiss her claims with a blanket recitation as to why her proposed questions were improper. In most instances, her questions had either already been answered by the witness or were irrelevant to the issues before the jury. In other instances, the questions were confusing and/or argumentative. A few questions lacked sufficient basis. In one instance, the defense attorney incorrectly summarized the witness' testimony. Even taken all together, the exclusion of all of these questions did little to stymie Ms. Smith's ability to cross-examine witnesses.

V.

**[5]** Ms. Smith next presents a list of evidentiary rulings with which she disagreed. She generally asserts that most of these rulings violated the hearsay rule. She also argues that some demonstrative evidence was inaccurate. We disagree with all of her assertions.

An out-of-court statement offered in evidence to prove the truth of the matter asserted is not admissible. N.C.R. Evid. 801(c) (1992). Statements offered for other purposes are not hearsay. *See, e.g., State v. Coffey,* 326 N.C. 268, 389 S.E.2d 48 (1990) (statement offered to show basis for subsequent conduct is not hearsay); *State v. Gilbert,* 96 N.C. App. 363, 385 S.E.2d 825 (1989) (statement offered to corroborate testimony is not hearsay).

Ms. Smith objects to a number of statements offered by witnesses during the State's direct examination. However, nearly all of these statements explained subsequent conduct or corroborated prior testimony—they were not offered to prove the truth of the matter asserted. Therefore, the statements were all admissible. In addition, the trial court specifically limited the evidence by instructing the jury that the statements were not being offered to prove the matter asserted, but only to show the basis for the subsequent conduct or corroboration.

**[6]** Ms. Smith also objects to a police officer's testimony that the time on his dispatch computer was accurate. The officer testified as

to routine matters normally conducted in the regular course of his business. Although the State did not quite lay a proper foundation to show that the computer times were indeed accurate, this error was harmless and does not require reversal. Furthermore, Ms. Smith corrected this error by offering the same information during the officer's cross-examination.

[7] Ms. Smith also complains of the introduction of her statement to the police which contained remarks she attributed to Mrs. Mooney. Her statement to the police was an admission of a party opponent, and therefore admissible under N.C.R. Evid. 801(d) (1992). The remarks made by Mrs. Mooney were not hearsay in that they were not spoken or offered to prove the truth of the matter asserted.

[8] Finally, Ms. Smith argues that the timeline used throughout the trial by the prosecutor inaccurately reflected the evidence and created a danger of unfair prejudice. However, she fails to show that the "inaccuracies" in the timeline were in any way prejudicial. Furthermore, the listed facts in the timeline were verified by each witness as that witness testified. Small changes in the way a phrase was written as compared to the way the witness spoke the phrase did not alter the substance of the evidence offered.

The trial court properly admitted all of the evidence.

VI.

[9] Ms. Smith's next argument encompasses three separate complaints as to the trial court's treatment of a statement made by her to her aunt on the telephone. We hold that none of these matters requires reversal.

Ms. Smith first challenges the admission of her statement: "I heard it was a mercy killing, but there is no mercy to it because I don't believe in God. They say grandma's happy now, but I know that's not true because they will put her in the ground and the worms will eat her." Although Ms. Smith believes that this was the most damaging piece of evidence against her, and even refers to it as a "confession," we cannot say that it is any more inculpatory than any other evidence offered. In fact, arguably, the statement could be viewed as exculpatory.

Nonetheless, Ms. Smith argues that the trial court erred by denying her motion to have the jurors questioned concerning whether they had read about the statement in the local newspaper. After a *voir*

*dire* hearing, the court decided to allow the statement into evidence. After the hearing, but before the statement was admitted, a local newspaper published the details of the hearing on the front page. The trial court denied Ms. Smith's motion to inquire if any jurors had read or heard about the publication. We hold that the trial court did not err.

When there is a substantial reason to fear that the jury has become aware of improper and prejudicial matters, the trial court must question the jury as to whether such exposure has occurred and, if so, whether the exposure was prejudicial. *See State v. Barts*, 316 N.C. 666, 683, 343 S.E.2d 828, 839 (1986). However, other than the fact that the statement was in the paper, there is no basis to think that the jury had become aware of it. *See State v. Langford*, 319 N.C. 332, 336, 354 S.E.2d 518, 521 (1987); *Barts*, 316 N.C at 683, 343 S.E.2d at 839. Throughout the trial, consistent with the requirements of N.C. Gen. Stat. § 15A-1236(4) (1997), the judge repeatedly warned the jurors to avoid reading, watching, or listening to accounts of the trial. Absent a clearer suspicion that the jury was aware of the publication, the trial court did not err in refusing to question the jury about it. In fact, questioning the jury about whether they read the article may have done nothing more than alert them to a statement of which they were previously unaware. In any case, since the statement was thereafter admitted into evidence, there was no prejudice to Ms. Smith even if the jury *had* read the newspaper publication. *See Langford*, 319 N.C. at 336, 354 S.E.2d at 521.

[10] Ms. Smith next argues that the trial court erred by not declaring a mistrial due to an alleged discovery violation. N.C. Gen. Stat. § 15A-903(a)(2) (1997) requires a prosecutor to disclose to the defendant the substance of any relevant statements made by the defendant, in possession of the State, and the existence of which is known to the prosecutor.

In the case at bar, the prosecutor knew about the statement before the trial, but did not divulge it until after the trial was underway. Instead of granting a mistrial, the trial court ordered all witnesses who had already testified to be recalled for further examination.

A trial court is not required to impose sanctions for late discovery. Instead, it is a matter of discretion for the trial judge. N.C. Gen. Stat. § 15A-910 (1997); *State v. Weeks*, 322 N.C. 152, 171, 367 S.E.2d 895, 906 (1988). Sanctions will not be reversed on appeal

absent a showing of abuse of discretion. *See State v. Gardner*, 311 N.C. 489, 506, 319 S.E.2d 591, 603 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985).

In the case at bar, the trial court allowed Ms. Smith to recall witnesses in light of the new evidence. The court noted that she had possession of the statement for at least four days prior to its introduction, and under those circumstances, it enacted a less drastic sanction than a mistrial or the exclusion of evidence. Furthermore, there is no showing that this late revelation upset her trial strategy or that she was otherwise prejudiced by the late discovery. In fact, Ms. Smith used the statement in her closing argument to her advantage. The trial court did not abuse its discretion in not declaring a mistrial.

## VII.

**[11]** Ms. Smith next argues that the trial court erred by admitting two photographs of the grandmother's tongue after it had been removed from the head and sliced in half. Since these photographs were relevant to the cause of death, the trial court did not err in admitting them.

Determining the admissibility of a photograph is in the sound discretion of the trial court. *See Robinson*, 327 N.C. at 357, 395 S.E.2d at 408. The fact that a photograph is gruesome will not preclude its admission so long as it is used for illustrative purposes and so long as it is not so excessive or repetitive as to be aimed solely at unfairly prejudicing the jury. *See id.*, 327 N.C. at 356, 395 S.E.2d at 408.

In the case at bar, the probative value of the photographs of the tongue outweighed any prejudicial effect. The State used the photos to help prove that the grandmother had something crammed down her throat. The bruising on the tongue helped show that Mrs. Mooney's death was caused by violent means and also helped illustrate the testimony of the pathologist who had explained how she died. The trial judge reviewed the photos before admitting them to the jury. There was no abuse of discretion as to the photographs.

## VIII.

**[12]** Ms. Smith next argues that the trial court erred by allowing the prosecutor to argue, in closing argument, that she had big hands, was left-handed, was strong, and failed to react with tears for her grandmother. We disagree.

**STATE v. SMITH**

[135 N.C. App. 649 (1999)]

The prosecutor has wide latitude in the scope of his closing argument. *See State v. Small*, 328 N.C. 175, 184, 400 S.E.2d 413, 418 (1991). He must remain consistent with the record, but otherwise, the arguments of counsel are largely within the control of the trial court's discretion. *See id.*, 328 N.C. at 185, 400 S.E.2d at 418. However, evidence includes not only what the jury hears from the stand, but what it observes in the courtroom. *See State v. Brown*, 320 N.C. 179, 199, 358 S.E.2d 1, 15, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

In the case at bar, the prosecutor pointed out that Ms. Smith wrote with her left hand. He also told them that when they consider the circumstances of this case, they should consider the size of Ms. Smith's hands. He added, "She's 29 years old. She's young and she's strong." He elaborated no further on her strength, and given the context of his closing argument, the jury could reasonably have interpreted this to mean only that she was strong in relation to her 81-year-old grandmother. The prosecutor also drew attention to Ms. Smith's lack of reaction upon seeing the autopsy photographs. This too was a fact already observed by the jury—the prosecutor merely reminded them of her behavior. All of the prosecutor's remarks were related to matters observable in the courtroom, something which is appropriate for the jury to consider. *See Brown*, 320 N.C. at 199, 358 S.E.2d at 15.

Ms. Smith also argues that the prosecutor's remarks about her hands and strength, etc., drew a negative inference for the jury regarding her failure not to take the witness stand in violation of her right to remain silent. A review of the record shows no hint that the prosecutor improperly mentioned Ms. Smith's failure to take the stand, nor do the references to her appearance suggest that the prosecutor improperly referred to her refusal to take the stand. Calling attention to her demeanor and appearance did not infringe upon her right not to testify because they were not directed at her failure to take the stand. *See Brown*, 320 N.C. at 200, 358 S.E.2d at 16.

IX.

Ms. Smith lastly presents a catch-all type argument contending that the individual errors made during the course of the trial amount and rise to the level of reversible error when seen as a whole or on balance of this case. We disagree.

Having failed to point out any specific instance of error requiring reversal, Ms. Smith incorporates by reference, but does not spec-

ify, the numerous assignments of error included in the record. She urges this court to grant a new trial because the trial was full of errors so basic, so fundamental, and so lacking in fairness that justice was not done. *See State v. Potts*, 334 N.C. 575, 583, 433 S.E.2d 736, 740 (1993).

Aside from the fact that we will not review assignments of error that are not argued in the brief on appeal, Ms. Smith's last argument fails on its merits. We have found no instance of error in her case that is so basic, so fundamental, and so lacking in fairness that justice was not done.

No error.

Judges HORTON and EDMUNDS concur.