STATE OF NORTH CAROLINA v. JERRY WAYNE CONNER

No. 219A91

(Filed 4 March 1994)

1. **Jury § 235 (NCI4th) — capital trial — death qualification of jury**
   The trial court properly denied defendant's motion to prohibit the State from death qualifying the jury during the guilt phase of a capital trial.

   **Am Jur 2d, Jury § 290.**

2. **Jury § 96 (NCI4th) — capital trial — jury voir dire — order prohibiting questions previously asked by court — statutory violation — harmless error**
   The trial court's pretrial order in a capital trial forbidding defense counsel, under penalty of contempt, to repeat on *voir dire* any questions previously asked by the court unless the answer given made further questioning relevant violated N.C.G.S. § 15A-1214(c). However, this error did not constitute the denial of a constitutional right and did not result in prejudice entitling defendant to a new trial where the scope of the questions propounded by the court was so general as to allow defense counsel ample opportunity for further inquiry to determine whether any prospective juror harbored preconceived ideas

or beliefs; the record reveals numerous occasions when defense counsel was allowed to probe further into each potential juror's understanding of the burden of proof and the juror's ability to follow the law as explained by the court in determining guilt or innocence and, if necessary, the penalty to be imposed; and the record contains no questions not related to sentencing which defendant was prohibited from asking a person ultimately impaneled as a juror.

**Am Jur 2d, Jury §§ 195 et seq.**

**3. Jury § 139 (NCI4th)— jury voir dire—fairness of burden of proof—question properly excluded**

The trial court did not err in sustaining the State's objection to defense counsel's question as to whether potential jurors believed it was fair for the law to place a higher burden of proof on the State than on defendant since the role of a juror is not to weigh and make policy decisions concerning the fairness of the law, and an answer to the question thus would not reveal pertinent information bearing upon a potential juror's qualifications to serve as an impartial juror. Even if the trial court erred in sustaining the objection, the error was not prejudicial where each prospective juror had just answered that he or she understood that defendant did not have the State's burden of proof and would not hold defendant to the State's burden of proof, and the court immediately thereafter inquired about the jurors' ability to follow carefully the court's instructions on the parties' burden of proof.

**Am Jur 2d, Jury § 197.**

**4. Jury § 132 (NCI4th)— jury voir dire—exclusion of question about election not to testify—use of peremptory challenge**

Defendant was not prejudiced by any error in the trial court's refusal to permit defense counsel to ask a potential juror whether she would "hold it against" defendant if defendant elected not to testify where the juror was peremptorily challenged by defendant.

**Am Jur 2d, Jury § 197.**

**5. Jury § 243 (NCI4th)— capital trial—peremptory challenges— pretrial increase not allowed**

The trial court had no authority to allow defendant additional peremptory challenges at the pretrial stage of a capital

trial. Even if the trial court had such authority, defendant was not prejudiced by the denial of his pretrial motion for additional challenges where defendant had three unused peremptory challenges when the jury, including the alternates, was impaneled. N.C.G.S. § 15A-1217.

**Am Jur 2d, Jury §§ 242 et seq.**

6. **Jury § 190 (NCI4th) — denial of challenge for cause — exhaustion of peremptory challenges**

A defendant cannot show prejudice by the denial of a challenge for cause until he has exhausted his peremptory challenges, has made a renewed challenge for cause which was denied, and has requested and been denied an additional peremptory challenge. N.C.G.S. § 15A-1214(h).

**Am Jur 2d, Jury § 218.**

7. **Homicide § 552 (NCI4th) — first-degree murder — second-degree instruction not required**

There was no evidence of a lack of premeditation and deliberation in a prosecution for two first-degree murders which would require the trial court to instruct the jury on second-degree murder where the evidence tended to show that defendant drove from his home in Ahoskie to a store outside Gatesville with the intention of killing the store owner for money; he entered the store on at least one earlier occasion hoping to find the store empty of customers; he devised a scheme posing as a DEA agent to clear the parking lot; he then entered the store carrying a 12-gauge sawed-off shotgun; as he approached the owner, he told her he was going to kill her; he forced her onto a lounge chair behind the counter and shot her from a very short distance; and when startled by the appearance of the owner's daughter entering the main room of the store, he held her at gunpoint, raped her, and then shot and killed her also.

**Am Jur 2d, Homicide § 526.**

8. **Criminal Law § 757 (NCI4th) — instruction on reasonable doubt — due process**

The trial court's instruction defining reasonable doubt as "an honest substantial misgiving based upon the jury's reason and common sense and reasonably arising out of some or all

of the evidence that has been presented or the lack or insufficiency of that evidence" did not reduce the State's burden of proof in violation of defendant's constitutional right to due process.

**Am Jur 2d, Trial §§ 829 et seq.**

9. **Homicide § 489 (NCI4th) — lack of provocation — consideration on question of premeditation and deliberation — propriety of instruction**

The trial court's instruction that lack of provocation on the part of the victim is one of the circumstances which may be considered by the jury on the question of whether defendant acted with premeditation and deliberation did not impose upon defendant the burden to produce evidence of provocation in order to avoid conviction and thus did not relieve the State of its burden of proving every element of the crime charged beyond a reasonable doubt. Additionally, the instruction was justified because the evidence failed to show legal provocation sufficient to negate premeditation and deliberation where the only possible evidence of provocation was defendant's statement to an officer that he had been drinking when he entered a store; a white male taunted him and the store owner called him a troublemaker; defendant challenged the white male to fight outside, but the white male left the premises; and defendant obtained a shotgun from his car, reentered the store, shot and killed the owner, and then raped and killed her daughter.

**Am Jur 2d, Homicide § 500.**

10. **Criminal Law § 751 (NCI4th) — instructions — ascertainment of truth as aim of trial — reasonable doubt standard**

The trial court's instruction that the highest aim of every legal contest is the ascertainment of the truth could not have misled a reasonable juror concerning the reasonable doubt standard and was not improper.

**Am Jur 2d, Trial § 827 et seq.**

11. **Jury § 148 (NCI4th) — capital trial — automatic vote for death penalty — voir dire questions not allowed — due process violation — prejudicial error**

Defendant's due process right to a capital sentencing proceeding by a qualified, impartial jury was violated by the

trial court's refusal to permit defense counsel to ask some of the prospective jurors whether their support for the death penalty was such that they would find it difficult to consider voting for life imprisonment for a person convicted of first-degree murder and whether their belief in the death penalty would make it difficult for them to follow the law and consider life imprisonment for first-degree murder. Although defense counsel did not use the words "automatically" or "always," the gist of the questions was an attempt by counsel to determine whether each prospective juror was willing to consider life imprisonment in the appropriate circumstances or would automatically vote for death upon conviction. General "follow the law" questions by the trial court were insufficient to determine any predilection of a juror toward imposing the death penalty, and the trial court's failure to allow defendant to "life qualify" all of the jurors who sat on the jury in defendant's trial constituted prejudicial error entitling defendant to a new sentencing hearing.

**Am Jur 2d, Jury § 197.**

**12. Jury § 148 (NCI4th) — capital trial — voir dire — appropriateness of death penalty — improper question**

The trial court did not err by refusing to permit defense counsel to ask prospective jurors in a capital trial whether they felt that the death penalty is the appropriate penalty for someone convicted of first-degree murder since this question was overly broad and called for a legislative, policy decision.

**Am Jur 2d, Jury § 197.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from two judgments imposing death sentences entered by Watts, J., at the 15 April 1991 Criminal Session of Superior Court, Gates County. Defendant's motion to bypass the Court of Appeals and to review the judgments entered on the additional felony convictions for first-degree rape and robbery with a dangerous weapon was allowed by the Supreme Court on 6 August 1992. Heard in the Supreme Court 16 March 1993.

STATE v. CONNER

[335 N.C. 618 (1994)]

*Michael F. Easley, Attorney General, by Steven F. Bryant, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, for defendant-appellant.*

PARKER, Justice.

Defendant, Jerry Wayne Conner, was indicted for the 18 August 1990 first-degree rape and first-degree murder of Linda Minh Rogers ("Linda"), the first-degree murder of her mother, Minh Linda Luong Rogers ("Minh"), and robbery with a dangerous weapon. He was tried capitally at the 15 April 1991 Criminal Session of Superior Court, Gates County. The jury found him guilty as charged and, following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, recommended defendant be sentenced to death for both first-degree murder convictions. Judgments of death on the two murder convictions were entered on 30 April 1991; defendant was also sentenced to life imprisonment for the first-degree rape and to forty years' imprisonment for robbery with a firearm. An order staying execution of the death sentences was entered on 7 May 1991 pending the conclusion of this appeal.

The State's evidence at trial tended to show that on the evening of 18 August 1990, Harold Lowe, his girlfriend, Kathy Winslow, and Chris Bailey stopped at Rogers' Grocery outside Gatesville, North Carolina, at approximately 9:30 p.m. They parked in the lot under a streetlight facing the highway waiting for a friend, Will Harrell, to arrive. After a few minutes, Harold Lowe saw Minh Rogers and an unknown white male leave the store. Minh and the man talked for a few minutes and then Minh Rogers reentered the building. Chris Bailey testified that he first noticed the white male walking from the store toward a white car parked in the lot. A few moments later, that same white male was carrying a shotgun and walking toward the vehicle in which Bailey was sitting.

Not having paid further attention after Minh Rogers reentered the store, Mr. Lowe testified he was startled when that same man appeared at the passenger window of his truck holding "some kind of identification with a picture." The man stated he was an agent with DEA and that undercover officers were preparing to execute a drug bust in the immediate vicinity in an effort to seize over $1.5 million worth of cocaine. He further informed Mr. Lowe

that if he did not want to be an accessory to the crime, he and his friends should leave the premises immediately. Lowe, Bailey, and Winslow each positively identified defendant at trial as the man who approached their car and warned them to leave the parking lot.

Will Harrell testified that he stopped by Rogers' Grocery at approximately 9:50 p.m. on the evening of 18 August 1990. As he entered the store, he recognized the owner of the establishment talking to a white male he did not know. The white male was of medium build, was approximately five-feet ten inches tall, and was wearing a plaid shirt and a baseball cap. At trial, Mr. Harrell positively identified defendant as the man he saw in Rogers' Grocery on the night of 18 August 1990.

SBI Agent Eric A. Hooks testified to statements made by Daniel Oliver Croy in a series of interviews beginning on the morning of 19 August 1990. In essence, Mr. Croy told various investigating officers that he stopped by Rogers' Grocery on the evening of 18 August 1990 after dinner. He "drank some beer, sat around, and talked with Linda [sic] Rogers, [and] her daughter." During this time, a white stocky male of medium height, thirty to thirty-five years of age, entered the store, made some purchases, chatted for a while with Minh and then left. Mr. Croy noted that the individual had a moustache and was wearing a baseball cap. Mr. Croy left the grocery store around 8:45 p.m.; and as he was backing out of his parking space, the same man he had seen inside Rogers' Grocery drove up beside him on the driver's side of the car. The man told Mr. Croy that he was an "SBI agent working with DEA on a big drug deal that was going down in the area." At one point during the conversation, the man asked Mr. Croy if he would like to see his credentials. He then held up a pump shotgun and said "there's my credentials." Mr. Croy left shortly thereafter but recalls that the lights in the store were on and the store was apparently still open.

John Lambert, a part-time employee of Rogers' Grocery, testified that on the morning of 19 August 1990, he arrived at the store at 9:00 a.m. only to find he had left his key at home. After retracing his steps, he returned to the store with the key and noted that the door lock didn't make the usual clicking sound. He then realized the door had apparently been left open overnight. When he entered the store, Mr. Lambert found the bodies of Minh and Linda Rogers.

Deputy George M. Ryan of the Gates County Sheriff's Department described the crime scene. The nude body of Linda Rogers was lying on her back in a large pool of blood concentrated around her neck, shoulders, and abdomen. He noted a gaping gunshot wound in her upper chest and that the teeth in her mouth were "just shattered." Minh Rogers' body was found on a lounge chair behind the counter. Although she was fully clothed, her pullover sweater had been pulled up just below her breasts and her shorts had been unzipped and pulled down. She was covered in blood. After securing the scene, Deputy Ryan notified the SBI.

Dr. Page Hudson, former Chief Medical Examiner for the State of North Carolina, performed the autopsies on 20 August 1990. He stated that the cause of death for Minh Rogers was a gunshot wound to the head causing massive destruction of the skull and brain. He further opined that the shot was fired from a very short distance—two to four feet. Spermatozoa were present in the vaginal cavity of Linda Rogers indicating that she had been sexually active just prior to her death. The younger woman died from a "shotgun wound to the under surface of chin and neck."

On the morning of 31 August 1990, SBI Special Agent Malcolm McLeod, Gates County Deputy Sheriff George Ryan, and Hertford County Deputy Sheriff Ronnie Stallings questioned defendant concerning the murders at Rogers' Grocery on the night of 18 August. After an initial attempt to mislead the officers, defendant related the following sequence of events. On the day defendant was fired from his job as a truck driver with Rose Brothers (either the thirteenth or fourteenth of August 1990), he stopped at the Fast Fare in Murfreesboro. He engaged in an extensive conversation with a black male whom he did not know personally but had seen on numerous occasions. The man was approximately six-feet tall, weighed 240 pounds, and was in his thirties with slightly graying hair. The conversation centered upon whether defendant was interested in making some quick, "illegal money." Even after being offered $7000 to kill a "Japanese woman who ran a store in Gates County," defendant informed the man he was not interested and left. However, as financial problems began to arise, defendant drove back to Murfreesboro to locate the black male. When he was unable to find him, defendant decided to kill the woman and try to collect the money afterwards.

Defendant further informed the officers that on Saturday, 18 August, he drove to Gates County, located Rogers' Grocery, and went inside. He left shortly thereafter since there were several customers inside. On the next several times he drove by, there were vehicles in the parking lot. When he finally found the lot relatively empty, he parked his car and entered the store carrying his 12-gauge pump, sawed-off shotgun with pistol grips. When he walked in, defendant told Minh Rogers he was going to shoot her. She laughed. He then forced her to lie down upon a lounge chair located behind the counter. When she attempted to rise, he shot her in the upper chest area from a distance of approximately eight (8) inches. Upon being startled by the victim's teenage daughter entering the main room of the store, defendant held her at gunpoint. After searching her for a weapon, he ordered her to take off her clothes. He then raped Linda Rogers and shot her in the upper chest. Defendant remembered talking with some people in the parking lot of Rogers' Grocery but does not recall identifying himself as a law enforcement officer. Before fleeing the scene, defendant picked up a dark colored briefcase, a bank bag, and the money from the cash register.

Defendant modified this version of his confession to state that, on 18 August 1990, he had stopped in Rogers' Grocery to get something to drink. An older white male and the woman who owned the store started to tease him—calling him "cowgirl" or "cowboy". He became angry, left the store, and went to Alvin Riddick's home where he stayed until after dark. While drinking two bottles of George Dickel whiskey, defendant became more and more upset about his treatment at the store earlier in the day. He returned to the store finding only Minh Rogers and the white male present. As he entered the store, the white male called him a "dickhead." Defendant suggested the two men go outside and fight. Outside, however, the unidentified white male indicated he was not interested in fighting and left. Defendant then proceeded to kill the two women as he previously indicated.

The State produced extensive physical evidence through numerous witnesses including SBI agents, FBI agents, and deputies of the Gates and Hertford County Sheriffs' Departments which corroborated the testimony of the prosecution witnesses and the main elements of defendant's confession. However, a recital of these facts is unnecessary for a full understanding of this opinion. Addi-

tional facts, when needed, will be set forth with respect to the various issues.

Defendant presented no evidence during the guilt-innocence phase of the trial. The jury found defendant guilty of two counts of first-degree murder based on both premeditation and deliberation and the felony-murder rule, one count of first-degree rape, and one count of robbery with a firearm.

During the capital sentencing proceeding, on both counts of first-degree murder, the jury found as aggravating circumstances that the murder was committed while defendant was engaged (i) in the commission of a felony and (ii) in a course of conduct which included the commission by defendant of other crimes of violence against another person. In mitigation of the murder of Linda Rogers, the jury found the statutory mitigating circumstance that the murder was committed while defendant was under the influence of a mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2), and the nonstatutory mitigating circumstance that defendant suffers from a psychosexual disorder. In mitigation of the murder of Minh Rogers, the jury found the nonstatutory mitigating circumstances that defendant voluntarily waived his constitutional rights to remain silent and to have the assistance of an attorney on the morning of 31 August 1990 and that he cooperated with law enforcement officers in addition to confessing guilt. Based upon a finding on both counts that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty, the jury recommended that defendant be sentenced to death for the murders of Minh and Linda Rogers.

On appeal defendant has brought forward numerous assignments of error. We find no error meriting reversal of defendant's convictions; however, for error in jury selection as discussed herein, defendant is entitled to a new capital sentencing proceeding.

I.

PRETRIAL AND JURY SELECTION

[1] Defendant first contends that he is entitled to a new trial because the trial court erred in overruling his motion for a nondeath qualified jury. Prior to trial, defense counsel moved the court to prevent the State from death-qualifying the jury. While acknowledging "that the law is against us," counsel argued that "death qualify-

ing" a jury prior to a determination of guilt or innocence enhances the odds of impaneling a jury prone to convict. This issue was settled by the United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985). *See State v. Taylor*, 304 N.C. 249, 259, 283 S.E.2d 761, 769 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398 (1983). This assignment of error is overruled.

[2] Defendant also contends the trial court erred in entering a pretrial order forbidding defendant, "under penalty of contempt," to repeat on *voir dire* any questions previously asked by the court unless the answer given made further questioning relevant. The order set forth, in pertinent part:

2. VOIR DIRE

. . . .

E. Counsel will be required to observe the limits of jury voir dire set out in *State vs. Phillips*, 300 N.C. 678 (1980) and *State vs. Vinson*, 287 N.C. 326 (1972); in this regard, counsel are specifically admonished (under penalty of contempt) that they shall not:

. . . .

7. Repeat questions previously asked by the Court unless the answer given makes further questioning relevant.

During a pretrial conference, out of the presence of the venire, defense counsel raised concerns about the impact of this restriction, among others, on defendant's ability to question each juror and directed the court's attention to N.C.G.S. § 15A-1214(c). Thereafter, defendant entered a general exception to entry of the order. Thus, contrary to the State's contention, this assignment of error is subject to harmless error, not plain error, analysis.

The statute applicable to *voir dire* provides:

(c) The prosecutor and the defense counsel, or the defendant if not represented by counsel, may personally question prospective jurors individually concerning their fitness and competency to serve as jurors in the case to determine whether there is a basis for a challenge for cause or whether to exercise a peremptory challenge. The prosecution or defense is not

foreclosed from asking a question merely because the court has previously asked the same or similar question.

N.C.G.S. § 15A-1214(c) (1988). Defendant contends that the provision of the pretrial order prohibiting counsel, under penalty of contempt, from taking advantage of a right expressly given by the statute constitutes error. We agree.

"The purpose of the *voir dire* examination and the exercise of challenges, either peremptory or for cause, is to eliminate extremes of partiality and to assure both the defendant and the State that the persons chosen to decide the guilt or innocence of the accused will reach that decision solely upon the evidence produced at trial." *State v. Honeycutt*, 285 N.C. 174, 179, 203 S.E.2d 844, 848 (1974), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1207 (1976) (quoting *Swain v. Alabama*, 380 U.S. 202, 13 L. Ed. 2d 759 (1965)).

This Court has held that "counsel's examination into the fitness of the jurors is subject to the trial judge's close supervision. The regulation of the manner and extent of the inquiry rests largely in the trial judge's discretion." *State v. Bracey*, 303 N.C. 112, 119, 277 S.E.2d 390, 395 (1981); *State v. Jackson*, 284 N.C. 321, 325, 200 S.E.2d 626, 629 (1973). Nevertheless, "part of the guaranty of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. ---, ---, 119 L. Ed. 2d 492, 503 (1992). In order to probe any such specific concerns, a defendant on trial for his life should be given great latitude in examining potential jurors. *State v. Vinson*, 287 N.C. 326, 215 S.E.2d 60 (1975), *judgment vacated in part*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976).

Our legislature acknowledged the significance of an adequate *voir dire* in enacting N.C.G.S. § 15A-1214(c). The trial court's pretrial order is in direct contravention of the language and meaning of the statute. We find, therefore, that the restriction prohibiting defendant from asking questions previously asked by the court violated N.C.G.S. § 15A-1214(c) and was error.

We next must determine the prejudicial effect, if any, of the error. Defendant contends the error requires a new trial because the nature of the error made preservation of a record to demonstrate prejudice impossible. To support his argument defendant cites *State v. Mitchell*, 321 N.C. 650, 365 S.E.2d 554 (1984) (holding prejudicial

error to preclude second counsel from arguing to jury in capital case in violation of N.C.G.S. § 84-14); *State v. Hucks*, 323 N.C. 574, 374 S.E.2d 240 (1988) (holding prejudicial error to try defendant in capital case without appointing second counsel in violation of N.C.G.S. § 7A-450(b1) ); and *State v. Ashe*, 314 N.C. 28, 331 S.E.2d 652 (1985) (holding prejudicial error not to return the jury to the courtroom and to exercise discretion when jury had a question or request during deliberations in violation of N.C.G.S. § 15A-1233(a) ). These cases are distinguishable from the present case, however. Unlike *Mitchell*, *Hucks*, and *Ashe*, the statutory violation in this case does not circumvent a substantial right and the prejudicial effect of the violation is not a matter of speculation. To the contrary, the questions propounded by the trial judge and by counsel are readily reviewable in the record. The only questions not permitted by the offending order were ones asked and answered. The error does not constitute denial of a constitutional right but rather a right granted by statute. The standard for determining prejudicial error is, therefore, governed by N.C.G.S. § 15A-1443(a), and the determinative issue is whether "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a) (1988).

The transcript discloses that the court asked every potential juror slight variations of the following litany of questions before turning the *voir dire* over to the prosecutor and defense counsel:

> [Name], if you are selected to serve as a juror in this case, can and will you follow the law as it will be explained to you by the Court in deciding whether defendant is guilty or not guilty of either-or both of these charges of first degree murder or any lesser homicide which the Court might submit to you?
>
> . . . .
>
> Secondly, if you are satisfied beyond a reasonable doubt of those things necessary to constitute first degree murder upon either-or both of the charges, can and will you vote to return a verdict of guilty of first degree murder even though you know that death is one of the possible penalties that can be accrued from such a verdict?
>
> . . . .

Considering your personal beliefs about the death penalty, [Name], state whether you would be able or unable to vote for a recommendation of the death penalty even though you are satisfied beyond a reasonable doubt the State has met it's burden of proving the three things required by law concerning the aggravating and mitigating circumstances?

. . . .

And if the defendant is convicted of first degree murder, can and will you follow the law of North Carolina as to sentence recommendation to be made by the jury as the Court explains it to you at the appropriate time?

The scope of the questions propounded by the court was so general as to allow defense counsel ample opportunity for further inquiry to determine whether any prospective juror harbored preconceived ideas or beliefs. Our review of the transcript reveals numerous occasions when defense counsel was allowed to probe further into each potential juror's understanding of the burden of proof and their ability to follow the law as explained by the court in determining the guilt or innocence of defendant and, if necessary, the penalty to be imposed.

The record also demonstrates that defendant was freely permitted to expand upon and repeat questions previously propounded by the court. Except for the question concerning burden of proof discussed in a later assignment of error, the record is devoid of any questions not related to sentencing which defendant was prohibited from asking a person ultimately impaneled as a juror. Defendant has preserved no other questions in the record. For these reasons, on the record before this Court in this case, we hold that defendant has failed to demonstrate that the error resulted in prejudice entitling him to a new trial.

[3] Defendant next assigns error to the trial court's failure to allow defense counsel to question potential jurors concerning their feelings about the law of burden of proof and defendant's right not to testify during the trial.

Defendant lists six instances where he contends the trial court improperly sustained the State's objections to questions propounded to a juror concerning whether or not he or she believed it was "fair" for the State to be burdened with the "reasonable doubt" standard. A review of the record reveals that four of the objections

were made and sustained based on the form of the question propounded to the potential juror on the State's burden of proof. The trial court noted the problem and defense counsel rephrased the question. In one of the two remaining instances where objections were made and sustained to questions attempting to ask the juror if he or she felt it was fair for the law to place a higher burden of proof on the State than on defendant, the juror was peremptorily challenged by defendant, and as will be discussed later, defendant did not exhaust his peremptory challenges.

In the remaining instance, the following colloquy occurred:

> MR. WARMACK: And what I want to ask you is this. Will you hold us to our burden of proof and not require — not hold us to the State's burden of proof? We do not have to prove as much to you as the State does. Do you understand that?
>
> THE JURORS: Yes.
>
> MR. WARMACK: Do any of you have any problems with that? Does anybody think that's not fair or that's not the way it ought to be?
>
> MR. PARRISH: Objection.
>
> THE COURT: Sustained. I think the ultimate question, members of the jury, will you be able to follow the Court's instructions if we reach that point in the trial? Will you follow the instructions which I have to give you with regard to burdens that would be upon both sides and follow those instructions carefully and closely?
>
> THE JURORS: Yes, sir.

We note first that of the five potential jurors being questioned at that time, only one was not peremptorily removed by defendant. Even giving defendant wide latitude in examining potential jurors, the question to which the objection was sustained has no reasonable expectation of revealing pertinent information bearing upon the potential juror's qualifications to serve as an impartial juror. The role of the juror is not to weigh and make policy decisions concerning the fairness of the law. Each prospective juror had just answered that he or she understood that defendant did not have the State's burden of proof and would not hold defendant to the State's burden of proof. In view of this question and answer, assuming arguendo that sustaining the objection to the next question was error, the

STATE v. CONNER

[335 N.C. 618 (1994)]

court's specific inquiry concerning the jurors' ability to follow carefully the court's instructions on the parties' burden of proof adequately addressed the issue.

[4] As to defendant's argument concerning questions relating to defendant's right not to testify, defense counsel repeatedly attempted to ask a potential juror whether or not she would "hold it against" defendant if defendant elected not to testify. The person being examined was peremptorily challenged by defendant; therefore, defendant, not having exhausted his peremptory challenges, the error, if any, could not have been prejudicial to defendant. This assignment of error is without merit and is overruled.

[5] Defendant next argues that the trial court erred in not allowing defense counsel to question a potential juror regarding a prior relationship with one of the victims and in not granting defendant's pretrial motion for additional peremptory challenges. At the pretrial motion hearing on 15 February 1991, the trial court, relying on N.C.G.S. § 15A-1217, denied defendant's motion for additional peremptory challenges. This action was not error. The statute specifically states that, in capital cases, the defendant is allowed fourteen challenges. N.C.G.S. § 15A-1217(a) (1988). Nothing in this statute or any other statute authorizes the trial judge to allow defendant additional challenges at the pretrial stage. *See State v. Brown*, 306 N.C. 151, 173-74, 293 S.E.2d 569, 584, *cert. denied*, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982); *State v. Johnson*, 298 N.C. 355, 259 S.E.2d 752 (1979).

"Even if the trial judge had authority to increase the number of peremptory challenges, a power which is precluded by G.S. 15A-1217," *Johnson*, 289 N.C. at 363, 259 S.E.2d at 758, defendant was not prejudiced by the denial of his motion. The record reflects that prior to the selection of the alternate jurors, defendant had used eleven of his fourteen peremptory challenges in selecting the original twelve. These remaining three challenges were added to the additional one for each of the two alternate jurors as required by the statute. Defendant exercised one peremptory challenge during the selection of the two alternates, and had four challenges left at the conclusion of the *voir dire*. When one of the original jurors was hospitalized prior to the jury being impaneled, the court reopened the *voir dire* to select another alternate juror. Each party was given an additional peremptory challenge to add to any remaining challenges. Defendant exercised two of his five available peremp-

STATE v. CONNER

[335 N.C. 618 (1994)]

tory challenges in choosing the final alternate juror. Thus, when the jury, including alternates, was impaneled, defendant had three unused peremptory challenges.

[6] During the *voir dire*, one prospective juror indicated that she had occasionally substituted as a teacher at the school where Linda Rogers was a student. Defendant contends that he was entitled to question this prospective juror fully to determine if grounds existed for a challenge for cause. Since the court restricted his questioning, defendant argues he was forced to use one of his limited challenges to excuse a juror who may well have been excusable for cause.

This argument is meritless for the reason that a defendant cannot show prejudice by the denial of a challenge for cause until such time as he has exhausted his peremptory challenges, has made a renewed challenge for cause which has been denied, and has requested and been denied an additional peremptory challenge. N.C.G.S. § 15A-1214(h) (1988).

II.

GUILT PHASE

[7] In his next assignment of error, defendant contends that the trial court erroneously failed to instruct the jury on second-degree murder. Defendant maintains there was evidence from which the jury could reasonably have found that defendant killed the two women with malice, but without premeditation and deliberation, and, therefore, it was error not to have instructed on the lesser-included offense. The State counters that the record is devoid of any evidence of provocation or of any other testimony which would support the charge of second-degree murder. We agree with the State.

The test for determining whether an instruction on second-degree murder is required is as follows:

The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the

trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). "It is unquestioned that the trial judge must instruct the jury as to a lesser-included offense of the crime charged, when there is evidence from which the jury could find that the defendant committed the lesser offense." *State v. Redfern*, 291 N.C. 319, 321, 230 S.E.2d 152, 153 (1976).

Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation. *State v. Myers*, 299 N.C. 671, 263 S.E.2d 768 (1980). Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *State v. Hamlet*, 312 N.C. 162, 321 S.E.2d 837 (1984).

The evidence in this case supports each and every element of first-degree murder, including premeditation and deliberation. The State's evidence showed that defendant drove to the store outside Gatesville from his home in Ahoskie, North Carolina, with the intention of killing Minh Rogers for money; he entered the premises on at least one earlier occasion hoping to find the store empty of customers; he devised a scheme posing as a DEA agent to clear the parking lot; he then entered Rogers' Grocery carrying a 12-gauge, sawed-off shotgun; as he approached Minh Rogers, he told her he was going to kill her; he forced her onto a lounge chair behind the counter and then shot her from a very short distance; when startled by the appearance of Linda Rogers entering the main room of the store, he held her at gunpoint, raped and then shot and killed her also. These facts indicate two coldly, calculated murders, not killings "occurring on the 'spur of the moment' in response to some unanticipated provocation." *State v. Cummings*, 326 N.C. 298, 317, 389 S.E.2d 66, 77 (1990) (*Cummings I*). The trial court did not err by refusing to instruct the jury on second-degree murder.

[8] Defendant next asserts that the trial court's instruction on reasonable doubt reduced the State's burden of proof below the "beyond a reasonable doubt" standard informed by *Cage v. Louisiana*,

498 U.S. 39, 112 L. Ed. 2d 339 (1990) (per curiam). The trial court gave the following instruction:

> Now, you've heard counsel in the course of their speeches to you refer to the term "Reasonable doubt" or the phrase "Beyond a reasonable doubt." The question quite naturally arises what kind of a doubt is a reasonable doubt? A reasonable doubt, ladies and gentlemen, means just exactly what the very words themselves would say and would imply to you.
>
> It's a doubt based upon your reason and your common sense. It has been said that a reasonable doubt is not a mere vain, fanciful, academic or forced doubt because there are few things in human experience which are beyond all doubt or which can even be said to fall beyond a shadow of a doubt. Nor is a reasonable doubt a doubt suggested by the ingenuity of counsel or even one raised by your own ingenuity of mind unless legitimately warranted by the testimony and by the evidence in this case.
>
> Your reason and common sense ought to tell you that a doubt would not be reasonable if it was founded upon or based upon that type of consideration. A reasonable doubt is used in the administration of the criminal law in North Carolina for more than 200 years, ladies and gentlemen, and has been defined by our State Supreme Court as a sane and sensible doubt, an honest substantial misgiving based upon the jury's reason and common sense and reasonably arising out of some or all of the evidence that has been presented or the lack or insufficiency of that evidence. That is to say some lack or some insufficiency in the evidence that fails to convince your mind and satisfy your reasoning of the guilt of an accused.
>
> Most simply put, ladies and gentlemen, proof beyond a reasonable doubt is that proof that fully satisfies or entirely convinces you of the defendant's guilt.

No objection was made during the charge conference when the judge indicated he intended to use his standard instruction on "reasonable doubt" nor was an objection raised when the judge actually charged the jury. Defendant acknowledges his failure to object in either instance but contends that the instruction amounted

to plain error under *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983).

We first consider whether the instruction as given constitutes error. In *Cage*, the United States Supreme Court determined that the reasonable doubt instruction used in petitioner's trial was constitutionally defective. The instruction as given "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,' and stated that what was required was a 'moral certainty' that the defendant was guilty." *Cage*, 498 U.S. at 41, 112 L. Ed. 2d at 342. The Court held:

> It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Id.*

The instruction in the present case defines reasonable doubt as "an honest substantial misgiving based upon the jury's reason and common sense and reasonably arising out of some or all of the evidence that has been presented or the lack or insufficiency of that evidence." The instruction does not mention the terms "grave uncertainty," "actual substantial doubt," or "moral certainty." We reviewed a similar instruction in *State v. Hudson*, 331 N.C. 122, 415 S.E.2d 732 (1992), *cert. denied*, 506 U.S. ---, 122 L. Ed. 2d 136 (1993), and held:

> Significantly, the combination of the terms found offensive by the *Cage* Court is not present here. Indeed, none of the objectionable language present in *Cage*, "grave uncertainty," "actual substantial doubt," or "moral certainty," is evident in the instant jury instruction. Rather, here we are concerned merely with the phrase "substantial misgiving." Thus, like other courts that have considered this question, we conclude that the reasonable doubt instruction given here is not constitutionally unsound.

*Hudson*, 331 N.C. at 142-43, 415 S.E.2d at 742-43. *But see State v. Bryant*, 334 N.C. 333, 343, 432 S.E.2d 291, 297 (1993) (holding that use of terms "substantial misgiving" and "moral certainty" in combination in reasonable doubt instruction violates *Cage*). As in *Hudson*, we find the instruction in the instant case to be without error and, thus, we overrule this assignment of error.

**[9]** Defendant's next assignment of error takes exception to the trial court's jury instruction on premeditation and deliberation arguing it relieved the State of its constitutional burden of proving every element of the crime beyond a reasonable doubt. Defendant urges us to apply the plain error standard since he failed to object at trial. The trial court instructed the jury as follows:

And fifth, the State must prove that the defendant acted with deliberation, which means that he acted while he was in a cool state of mind. That does not mean, members of the jury, that there must be some total absence of passion or emotion if the intent to kill was formed with a fixed purpose, not under the influence of some suddenly aroused violent passion.

It is immaterial that the defendant was in a state of passion or excited when the intent was carried into effect. Neither premeditation nor deliberation are usually susceptible of direct proof, members of the jury. They may be proved by proof of circumstances from which they may be inferred such as lack of provocation on the part of the victim, the conduct of the defendant before, during, and after the killing, any threats or declarations of the defendant, and the manner in which or the means by which the killing was done.

Defendant contends that the instruction on "lack of provocation" blurs the distinction between first- and second-degree murder and allows the jury to find deliberation on an unsupported theory, thus reducing the State's burden of proof on first-degree murder.

However, "[a] prerequisite to our engaging in a 'plain error' analysis is the determination that the instruction complained of constitutes 'error' at all." *State v. Torain*, 316 N.C. 111, 116, 340 S.E.2d 465, 468, *cert. denied*, 479 U.S. 836, 93 L. Ed. 2d 77 (1986). Based on the record before us, we find that the instruction on premeditation and deliberation did not constitute error and a plain error analysis is inappropriate.

Defendant concedes, in his brief, that "[i]t has long been a part of the pattern jury instructions in this state that a lack of provocation on the part of the victim may be considered by the jury on the question of whether the defendant acted with deliberation." *See* N.C.P.I.—Crim. 206.10 (1989). Even though it is the burden of the State to prove each and every element of the crime charged, the instruction, according to defendant, imposes a burden upon defendant to produce evidence of provocation in order to avoid conviction. This burden, defendant argues, is contrary to his presumption of innocence. *See State v. Faulkner*, 241 N.C. 609, 86 S.E.2d 81 (1955).

The trial court properly instructed the jury that lack of provocation is merely one of many circumstances which, if found, the jury could use to infer premeditation and deliberation. *See generally State v. Jackson*, 317 N.C. 1, 343 S.E.2d 814 (1986), *vacated on other grounds*, 479 U.S. 1077, 94 L. Ed. 2d 133 (1987). "Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. Instead, they usually must be proved by circumstantial evidence." *Id.* at 23, 343 S.E.2d at 827. This Court held in *State v. Cummings*, 326 N.C. 298, 315, 389 S.E.2d 66, 76 (1990) (*Cummings I*), that each example listed by the trial court need not be proven beyond a reasonable doubt. "Therefore, the trial court's mere recital of such examples cannot be construed as an expression of an opinion that any of them have been proven." *State v. Stevenson*, 327 N.C. 259, 264, 393 S.E.2d 527, 529 (1990).

Additionally, we conclude that the challenged instruction was justified because the evidence failed to suggest that either victim provoked defendant. Since he presented no evidence during the guilt phase of the trial, the only possible evidence of provocation in the record is Deputy Ronnie Stallings' testimony concerning a statement given by defendant on 31 August 1990. Defendant confessed to Deputy Stallings that he had been drinking on 18 August 1990 when he entered Rogers' Grocery. A white male, not identified, taunted defendant, calling him a "dickhead". Minh Rogers called defendant a troublemaker. Defendant challenged the white male to fight outside. Once the two men were outside, the white male told defendant he was only kidding and left the premises. Defendant went to his car, picked up his 12-gauge, sawed-off shotgun, reentered the store, shot and killed Minh Rogers, and then raped and killed her daughter, Linda Rogers. Even assum-

ing the presence of an unidentified white male, the actions do not amount to legal provocation sufficient to negate premeditation and deliberation. The acts are not of such a nature as the law would deem adequate to " 'temporarily dethrone reason and displace malice.' " *State v. Cope*, 309 N.C. 47, 62, 305 S.E.2d 676, 685 (1983) (quoting *State v. Montague*, 298 N.C. 752, 756-57, 259 S.E.2d 899, 903 (1979) ("Mere words however abusive are not sufficient provocation to reduce second-degree murder to manslaughter.") ). "An unlawful killing is deliberate and premeditated if done pursuant to a fixed design to kill, notwithstanding that defendant was angry or in an emotional state at the time, unless such anger or emotion was such as to disturb the faculties and reason." *Jackson*, 317 N.C. at 24, 343 S.E.2d at 828. For these reasons, we find no error and, consequently, no plain error in the challenged portion of the instruction.

[10] Defendant next contends that the trial court committed plain error in instructing the jury that the ascertainment of the truth is the highest aim of a criminal trial. Defendant argues that the instruction improperly shifted the burden of persuasion by imposing upon him a duty to present a version of the truth consistent with his innocence. Defendant specifically objects to the following portion of the instruction:

> The highest aim of every legal contest is the ascertainment of the truth. Somewhere, somewhere within the facts of every single case the truth abides. And where you, the jury, find that truth, that is where justice steps in, garbed in her robes, to tip the scales. This is not a case of sympathy for anyone. It is not a case of prejudice against anyone. This is not a case in which you have some friend whom you should seek to reward. It is not a case in which you have some enemy whom you should seek to punish.

We have previously examined and approved this instruction in *State v. Garner*, 330 N.C. 273, 410 S.E.2d 861 (1991). Justice Frye, writing for a unanimous Court, noted:

> [The] instructions came verbatim from the criminal Pattern Jury Instructions. *See* N.C.P.I.—Crim. 101.36. Prior to that instruction, as part of his charge, Judge Allen instructed that "[t]he State must prove to you that the defendant is guilty beyond a reasonable doubt." The court then defined "reasonable". Moreover, Judge Allen repeated the reasonable doubt stand-

ard throughout the jury charge. Clearly, the record is replete with the trial court's instructions to the jury on reasonable doubt. When construed as a whole, no reasonable juror would have been misled.

*Id.* at 296, 410 S.E.2d at 874. In his jury charge in this case, Judge Watts also repeatedly instructed the jury that the State must prove defendant's guilt beyond a reasonable doubt and carefully explained the definitions of "reasonable" and "doubt". He then recited the "highest legal aim" jury instruction from the Pattern Jury Instructions. As in *Garner*, when viewed as a whole, the instructions as given would not mislead a reasonable juror on the premise of reasonable doubt. This assignment of error is without merit and a plain error analysis is, again, unnecessary.

## III.

### SENTENCING PROCEEDING

[11] Defendant argues that the trial court erred in limiting questions during *voir dire* regarding potential jurors' feelings about the death penalty. More specifically, defendant maintains he was prohibited from asking prospective jurors if they would automatically vote for the death penalty if defendant was found guilty of first-degree murder.

During *voir dire*, the trial court questioned the jurors regarding their ability to "follow the law" in imposing the death penalty but not in recommending a life sentence. The court first asked each juror if, knowing that the death penalty would be a possible sentence, he or she would be unable to find defendant guilty of first-degree murder. The court then inquired of each juror:

> THE COURT: Considering your personal beliefs about the death penalty, [Name], state whether you would be able or unable to vote for a recommendation of the death penalty even though you are satisfied beyond a reasonable doubt of the three things required by law concerning the aggravating and mitigating circumstances which the State is required to prove?

> . . . .

> THE COURT: All right. And if the defendant is convicted of first degree murder, [Name], can and will you follow the law of North Carolina as to the sentence recommendation re-

quired to be made by the jury as the Court will explain it to you at an appropriate time?

Twelve jurors were excused by the court for responding that they would automatically vote against the death penalty. If the juror responded that he or she would be able to recommend the death penalty and that he or she would follow the law as to the sentencing recommendation as the Court would explain it to them, the trial court passed that juror to the State for questioning.

Once the State passed the initial group of twelve potential jurors, defense counsel asked them the following questions to determine if their feelings about the death penalty were such that they would automatically vote for the death penalty rather than a life sentence.

> MR. WARMACK: Let me see if I can rephrase that, [Name]. You indicated earlier that you could vote for the death sentence under the appropriate circumstances. Could you also vote for the life—to recommend life under the appropriate circumstances?

> THE JUROR: Well, if I feel that the crime deserved life, yes.

> . . . .

> MR. WARMACK: [Name], you were nodding. Under the appropriate circumstances as I understand it, then that if the State did not meet its burden or if you thought that the case merited it you could recommend a recommendation of life; is that right?

> THE JUROR: Yes, sir.

> MR. WARMACK: And, [Name], I'll ask you the same question. If you did not feel like the circumstances of the case called for the imposition of the death penalty or the State had failed to meet its burden of proof, could or would you recommend to the Court that a life sentence be given in this case?

> THE JUROR: Yes.

These questions were allowed. Defendant accepted six of the original twelve potential jurors. In questioning the remaining potential jurors, defense counsel upon objection by the prosecution, was not allowed to ask the following questions:

**STATE v. CONNER**

[335 N.C. 618 (1994)]

Is your support for the death penalty such that you would find it difficult to consider voting for life imprisonment for a person convicted of first degree murder?

Would your belief in the death penalty make it difficult for you to follow the law and consider life imprisonment for first degree murder?

Do you feel that the death penalty is the appropriate penalty for someone convicted of first degree murder?

The trial court sustained each of the State's objections to these questions based on *State v. Taylor*, 304 N.C. 249, 265, 283 S.E.2d 761, 772. This Court, in *Taylor*, found certain questions improper because they were overly broad, incomplete as hypotheticals, and made no mention of mitigating or aggravating factors. *Id*. This Court has long recognized that ambiguous questions or hypotheticals misstating the law should not be allowed. *See State v. Vinson*, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *judgment vacated in part*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976).

In the present case, with some, but not all of the jurors who actually served, the court asked the juror individually the following question or a variation thereof during *voir dire*:

If we were to reach the penalty portion of the trial, will you carefully and thoroughly follow the Court's instructions with regard to the jury's duty concerning that portion and apply and follow those instructions closely and carefully?

The State contends that the general "follow the law" questions repeatedly asked by the trial court were sufficient to determine whether any prospective jurors were predisposed toward imposing the death penalty. We disagree. Since the trial of this case, the United States Supreme Court issued its opinion in *Morgan v. Illinois*, 504 U.S. ---, 119 L. Ed. 2d 492, holding that during *voir dire* in a capital case, the trial court's refusal to permit inquiry into whether a prospective juror would automatically vote to impose the death penalty upon defendant's conviction regardless of the evidence of mitigating circumstances is inconsistent with the Due Process Clause of the Fourteenth Amendment. Under *Morgan*, general "follow the law" questions are insufficient to determine any predilection a juror may have regarding the death penalty.

Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law. It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception. The risk that such jurors may have been empaneled in this case and "infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized."

*Id.* at ---, 119 L. Ed. 2d at 506-507 (alteration in original) (citation omitted) (footnote omitted) (quoting *Turner v. Murray*, 476 U.S. 28, 36, 90 L. Ed. 2d 27, 36 (1986)). The Court further noted that if a juror's stated willingness to "follow the law" were sufficient to render harmless any error in restricting *voir dire*, "death qualification" under *Witherspoon* and *Witt* would, as a matter of course, be unnecessary.

Were voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would *always* impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would *never* do so.

*Morgan*, 504 U.S. at ---, 119 L. Ed. 2d at 506.

The specific question giving rise to *Morgan* error is whether a prospective juror would *automatically* or *always* vote for the death penalty following conviction for a capital offense irrespective of the facts and circumstances. A potential juror's affirmative response to this question entitles defendant to challenge the juror for cause. Although the holding of *Morgan* is directed to this narrow question, the tenor of the language and the rationale in *Morgan* suggest that the wording of the question should not necessarily be limited to this specific inquiry but that a broader question should be permitted to assure a fair and impartial, qualified jury.

[12] In the present case, we conclude that although defense counsel did not use the words, "automatically" or "always," the gist of the questions was an attempt by counsel to determine whether the prospective juror was willing to consider a life sentence in

the appropriate circumstances or would automatically vote for death upon conviction. Indeed, in *Taylor*, decided almost eleven years before *Morgan*, this Court recognized that the questions were asked, "with the intention of showing that those jurors would automatically vote for the death penalty if defendant was found guilty." *State v. Taylor*, 304 N.C. at 265, 283 S.E.2d at 772. Accordingly, we hold that the first two questions noted above which the trial court did not allow should have been permitted. The third question, however, was overly broad, called for a legislative, policy decision, and was properly disallowed. Pursuant to *Morgan*, the trial court's failure to allow defendant to "life qualify" all the jurors who sat violated his due process right to a capital sentencing proceeding by a qualified, impartial jury.

An error that violates a defendant's rights under the United States Constitution is prejudicial unless the State can show that the error was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988). Only the first six jurors accepted by defendant were "life qualified." The remaining jurors' latent biases regarding punishment for first-degree murder were not explored on *voir dire*; hence, whether one or more of these jurors had a predisposition to impose the death penalty upon conviction without regard to the aggravating and mitigating circumstances is pure speculation. For this reason, the State cannot demonstrate that the error was harmless beyond a reasonable doubt. As the United States Supreme Court stated: "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan*, 504 U.S. at ---, 119 L. Ed. 2d at 503. Defendant, therefore, is entitled to a new sentencing hearing. *See Morgan*, 504 U.S. at --- n.11, 119 L. Ed. 2d at 509 n.11; *State v. Cummings*, 332 N.C. 487, 422 S.E.2d 692 (1992) (*Cummings II*); *State v. Robinson*, 327 N.C. 346, 395 S.E.2d 402 (1990) (holding that error under *Witherspoon* and *Witt* affects only the sentencing phase of a capital trial).

Finally, we note that in light of *Morgan* and this holding in the present case, the first three questions deemed inappropriate in *State v. Taylor*, 304 N.C. at 265, 283 S.E.2d at 772, would now be acceptable.

Since defendant is receiving a new capital sentencing proceeding as the result of *Morgan* error, we will not address the assignments of error argued in this portion of defendant's brief as they relate

**STATE v. CONNER**

[335 N.C. 618 (1994)]

only to sentencing issues and these same errors, if any, are unlikely to recur at the new proceeding.

## IV.

### PRESERVATION ISSUES

Defendant's remaining assignments of error relate to additional sentencing issues or to issues this Court has previously decided contrary to defendant's position, but which defendant nonetheless brings forward to preserve for further appellate review. Defendant is receiving a new capital sentencing hearing; therefore, we do not address those sentencing issues as the error, if any, is not likely to recur at the new proceeding. As to the remaining issues that previously have been ruled on by this Court, defendant's related assignments of error are overruled.

## V.

### CONCLUSION

In summary, we find no error in the guilt phase of defendant's trial for first-degree murder. For error in the jury selection which affected only the sentencing proceeding pursuant to *Morgan v. Illinois*, 504 U.S. ---, 119 L. Ed. 2d 492, we hereby order a new capital sentencing proceeding.

NO. 90CRS648—FIRST-DEGREE MURDER OF LINDA MINH ROGERS: NO ERROR IN THE GUILT PHASE; DEATH SENTENCE VACATED AND REMANDED FOR A NEW CAPITAL SENTENCING PROCEEDING.

NO. 90CRS649—FIRST-DEGREE MURDER OF MINH LINDA LUONG ROGERS: NO ERROR IN THE GUILT PHASE; DEATH SENTENCE VACATED AND REMANDED FOR A NEW CAPITAL SENTENCING PROCEEDING.

NO. 90CRS812—ROBBERY WITH A DANGEROUS WEAPON: NO ERROR.

NO. 90CRS813—FIRST-DEGREE RAPE: NO ERROR.