MARTIN, Chief Judge.
Respondents appeal from a decision of the Catawba County District Court adjudicating their child, P.C., born 13 November 1997, a neglected juvenile as defined by N.C. Gen. Stat. § 7B-101(15).
The evidence in the record discloses that on 3 September 2002, four-year-old P.C. touched another child inappropriately at her daycare center. When the daycare workers questioned her about this behavior, she revealed that her father touched her in a similar manner. The daycare center contacted the Catawba County Department of Social Services and the Newton Police Department about possible sexual abuse of P.C. by her father, respondent J.C. Thomas Neff, a Child Protective Services Investigator with the Catawba County Department of Social Services (DSS), and Janet Mace, a detective with the Newton Police Department, interviewed P.C. and her parents, J.C. and R.C., the following day.
Mr. Neff and Detective Mace first spoke with respondent-mother, R.C., at her home while waiting for her husband to come home from work. R.C. revealed the following information: her husband gives P.C. her baths, P.C. sleeps in the bed with them at night, P.C. calls her privates "kitty-cat," and P.C. likes to play with R.C.'s breasts, which P.C. calls "roller balls."
When J.C. arrived, Mr. Neff and Detective Mace explained the allegations. J.C. said that P.C.'s statements could have been referring to when he puts vaginal cream on her. Mr. Neff, however, told J.C. he did not feel that explanation fully accounted for P.C.'s actions. Then J.C. said, "All right, I'm going to give it to you straight . . . [P.C.] likes to be tickled." J.C. went on to say that her favorite place to be tickled is high up on her inner thigh, that she loves to run around the house naked, and that he is the one who bathes her due to his wife's bad knees and arthritis.
Later that day, Mr. Neff and Detective Mace interviewed P.C. Detective Mace asked P.C. questions while Mr. Neff took notes. She had P.C. identify several body parts on a drawing, which P.C. correctly identified. P.C. called the genital area "pee-pee." When asked what people do with their pee-pee, she replied that her mom and dad take her clothes off and tickle her pee-pee. Detective Mace then asked if she had ever felt anything inside her pee-pee. P.C. replied that her daddy puts a "secret tube" inside her "kitty-cat." Detective Mace asked if that hurt, and P.C. shook her head in the negative. She then volunteered that it tickles, that he tells her to close her eyes, and that he does it to Mommy too.
That afternoon, after the interview with P.C., J.C. went to the Newton Police Station and spoke with Mr. Neff and Detective Mace again. When asked if he had ever touched P.C.'s "kitty-cat," he said he was sure he had while tickling her. Detective Mace asked him to describe how he tickles her. According to J.C., P.C. will come to him and say "Daddy do me" and raise her arms in the air when she wants to be tickled. He demonstrated using the top side of his fingers and said he tickles her from the neck down. When P.C. wants to stop, she says she does not want to be tickled anymore and walks away.
Pursuant to these interviews, Detective Mace executed a search warrant of respondent-appellants' residence. There were no pornographic materials, photographs, or videos found. The computer contained no pornographic images or identified web sites, and there were no sexual aids discovered. The officers seized a blue and white bicycle or basketball pump, which P.C. identified as the "magic tube."
During the second interview with P.C. four days later, Detective Mace asked P.C. about the secret tube. P.C. answered that her father had told her the night before not to tell anyone where the tube was hidden. Detective Mace asked P.C. if her father had ever put the tube in her kitty-cat, and P.C. said yes. Detective Mace also asked if P.C. had ever touched her father's "ding-dong" (the term P.C. used for male genitalia) and whether she had put her mouth on it. P.C. answered both questions affirmatively.
The third interview took place three days later at P.C.'s daycare at the YMCA. Detective Mace asked P.C. if she remembered what they had talked about last time. P.C. responded that they had talked about her daddy's ding-dong. When Detective Mace asked what her father did with the magic tube, P.C. said he "sticks it in my pee-pee." During the interview, P.C. also said she sleeps in bed with her mother and father at night, and she wears "panties" to bed. When asked if anyone had ever touched her under her panties, she said that daddy had put his hand in her panties. Detective Mace asked where mommy was when daddy put his hand in her panties, and P.C. said mommy was in the bed and P.C. was on the couch.
Detective Mace then pulled out her key chain, which had attached to it a small baton three to four inches in length, and asked P.C. to demonstrate how she touches daddy's ding-dong using the baton. According to Mr. Neff's notes, "the child wrapped her hand around it and squeezed her hand while moving the stick up and down." The keys jingled as she shook the baton. Detective Mace asked where her mommy was when this happened, and P.C. replied that mommy was at work. She went on to say, "he lets me touch his ding-dong on Saturdays." When Detective Mace asked what she did with it, P.C. stated, "I squeeze it." Detective Mace asked where this happens, and P.C. said it happens on the couch. She said she lays on top of him and he has his shorts on. When asked how it felt, P.C. replied that it was soft. Detective Mace also asked if she had ever touched daddy's ding-dong with her mouth, and according to the trial transcript, P.C. said yes, followed by "Umm, tastes good, smells like apple deodorant." When asked if mommy had ever seen her touch daddy's ding-dong, she said, "No, Mommy would not like that."
As a result of these statements, the Department of Social Services removed P.C. from her home and placed her in the home of a licensed foster parent who was also a family friend of the parents. However, the foster parent reported that her nine-year-old child heard P.C. tell her five-year-old son to pull his pants down. The foster parent intervened before anything could happen. Soon after this incident, P.C. went to live in the home of her paternal aunt and uncle.
P.C. was given a physical examination to determine if there was physical evidence of abuse. The exam was not conclusive. The doctor found thickened tissue on the labia minora, which was most likely a scar from trauma. However, the examiner said the cause of the trauma could be accidental, self-inflicted, or abuse. The hymen was normal and intact. After the exam, the foster parent reported that P.C. began crying during her bath and said, "it hurts again." When questioned if she had ever hurt like that before, P.C. replied it had hurt when "Adam," a classmate, put his finger in her at daycare. She said "Adam" received a time out as punishment for this behavior. The daycare teacher said no such incident ever occurred.
P.C. was interviewed several times by psychologist Dr. James A. Powell. Dr. Powell was initially retained by respondent-appellant father to determine the origin of P.C.'s statements. During the first interview, P.C. stated spontaneously that "Daddy didn't do nothing." She denied having ever touched or seen a penis. When asked if she had ever put her mouth on a "ding-dong," she said "no." When asked about the secret tube, she first said she did not remember. Later she said, "it was a magic tube and daddy put it in my pee-pee and it was orange. It felt good. It felt perfect. That was the one mommy, daddy and me wanted. . . . It tickled when you put it in my pee-pee. When you turn it on." She said it sounded like a motor, and she circled the inside of the vagina of an anatomically correct doll to demonstrate. Dr. Powell concluded that "[t]he statements of [P.C.] indicate a sexual knowledge that is far beyond her chronological age." During the course of his interviews, Dr. Powell also learned that P.C. told her daycare workers that people were touching her "inappropriately" at times when the workers knew those people had not been present.
Respondent-appellant mother hired another psychologist, Dr. Jonathan Gould, Ph.D., to review the report by Dr. Powell. Dr. Gould did not interview P.C., the parents, or the investigators, but he reviewed Dr. Powell's written conclusions and evaluated the methods used to draw those conclusions. He did not testify in court, but he submitted a detailed report challenging the scientific value of Dr. Powell's report. He concluded the following:
In my professional judgment, the lack of considering alternative explanations of the data, the lack of using a scientifically informed evaluation protocol, the lack of specific, detailed, and consistent information from [P.C.], and the lack of integrating current scientifically informed research into explanations of [P.C.'s] behavior render the opinions and conclusions of this report unreliable. The nature of the information upon which opinions and conclusions were based did not include a proper scientific analysis of the data and, as a result, yielded opinions and conclusions that are biased.
Specifically, Dr. Gould cited Dr. Powell's failure to follow the Guidelines for Psychological Evaluations in Child Protection Matters. He found that Dr. Powell did not address the majority of the criteria recommended in the Guidelines in his assessment of P.C. He also objected to the use of anatomically correct dolls, which he said lack reliability as a form of investigating sexual abuse and fail to distinguish between abused and non-abused children. He quoted the North Carolina District Court Judges' Seminar from 1997, where it was stated that "there appears to be agreement that a child's play with anatomical dolls . . . is not a psychological test and may not be used to diagnose sexual abuse . . . largely because dolls may lead to inaccuracies in children's reports." Dr. Gould also stated that placing a child in sex abuse therapy before there has been a legal determination of abuse "may teach a child inaccurate and unreliable memories for events that did not occur," and "may well destroy any ability to obtain are liable statement from the child." Dr. Gould did not feel there was conclusive evidence of sexual abuse. He concluded that:
The data describing [P.C.'s] report of alleged abuse that is reported [by] Dr. Powell represents age-appropriate language containing either non-specific statements about her parents touching or inconsistent information about her parent's touching. There is no data to support Dr. Powell's view that [P.C.'s] language or [P.C.'s] behavior reflects anything but typical behavior seen among preschool children.
On 3 December 2002, P.C. gave testimony in the chambers of the trial judge. P.C. was questioned by Kirk Randleman, attorney for the Catawba County Department of Social Services, Gary Corne, attorney for respondent-appellant mother, Carolyn Crouch, Attorney Advocate, and the trial judge. Also present was Edward de Torres, attorney for respondent-appellant father.
During her testimony, P.C. made several statements that conflicted with her prior accounts. In her first interview with the investigators, P.C. said the tube went inside her. In her testimony, she first described the magic tube as "something that goes in your private that will be in the front part." However, when asked whether her father put the magic tube inside her or whether he just touched her with it, she replied, "he just touched me." P.C. testified she had never touched or seen her father's "ding-dong," also in conflict with her prior interviews. When asked what the magic tube looked like, P.C. replied, "the color is orange." Previously, she had identified a blue and white bicycle pump as the magic tube. At one point during her testimony P.C.said she could not remember if the tube made any noise. When asked again later, she said it made a noise like a motor, which was how she had previously described it to Dr. Powell.
The transcript of P.C.'s testimony revealed indecisiveness and an inability to focus. When asked how many times her father touched her with the tube, she first replied, "did I say three or two?" When prodded, she answered, "[i]t was three times." When asked if her mother ever touched her private parts, P.C. answered:
A: no - yes.
Q: She did?
A: I said no - yes.
Q: Which is it?
A: Yeah.
Q: She did?
A: Yes.
When asked if she had her underwear on or off when her father touched her with the tube, she said:
A: On - I mean, off.
Q: Off? Did you -
A: You've got longer hair than I do.
When the judge asked the same question later, P.C. replied "off - on." The judge also asked, "[w]hat did he do with his fingers in your private parts?" to which P.C. answered, "[h]e used to be able to French braid my hair." When asked, "[d]id your daddy say anything when he touched you with the magic tube?" P.C. answered, "I don't remember. I drew a fish." The trial judge later noted that P.C. answered many questions during her testimony with "I don't remember" or "I forgot." The trial judge adjudicated P.C. neglected on 15 July 2003. The adjudication order included the following three findings of fact about respondent-appellant parents:
Respondent parents have not been willing or able to recognize the significant nature of their daughter's sexualized behaviors, nor have respondent parents appropriately addressed those issues.
Respondent parents did not acknowledge the child's problems or seek help until after the Catawba County Department of Social Services filed this petition.
Respondent parents have contributed to their daughter's sexualized behavior through their activities and "play" with the minor child.
The court concluded as a matter of law that P.C. "is a neglected juvenile as defined by N.C. Gen. Stat. § 7B-101(15), in that she does not receive the proper care or supervision from the juvenile's parents, and that she lives in an environment injurious to the juvenile's welfare." There was no finding of abuse by respondent-appellant father. The court determined there was insufficient information to proceed with an appropriate disposition on that date. She ordered psychological and sex offender specific evaluations of both parents and set a disposition hearing for 12 August 2003 to consider the results and recommendations from those evaluations.
Dr. Jennifer S. Cappelletty, a clinical psychologist with the Carolina Treatment Associates, conducted the evaluations of the parents. Dr. Cappelletty found that "from an intellectual, emotional and behavioral perspective [R.C.] has the skills needed to appropriately nurture, discipline and provide for a child." Dr.Cappelletty found that J.C. has the capacity to be an adequate parent. She felt he had a significant bond with P.C. as he was her primary caretaker, and he seemed willing to learn new parenting skills.
Dr. Cappelletty expressed concerns, however, about both parents' ability to empathize with P.C. Neither parent would consider that P.C. may have been sexualized by a third party. According to Dr. Cappelletty, both parents felt that sexual abuse of a child was wrong, but neither parent demonstrated an understanding of why such abuse was wrong, and, therefore, could not fully grasp the seriousness of their child's behaviors. Dr. Cappelletty's greatest concern was that if P.C. were to be returned to her parents' home, the parents would not be able to protect her from future abuse. Their disbelief of her current sexualization indicated that future allegations of abuse, or future sexualized behavior, would be met by skepticism from her parents. Therefore, P.C. would not receive appropriate professional treatment to work through these problems.
Kathy Young-Sugar, a Licensed Clinical Social Worker with New Directions Counseling Services, testified at the disposition hearing on 12 August 2003. Ms. Young-Sugar had weekly counseling sessions with P.C. beginning in November 2002. She testified that P.C.'s temper tantrums and sexually reactive behaviors had escalated in the last two to three months while living with her aunt and uncle, who then decided they could not provide long-term care for P.C. as they had hoped. In August of 2003, P.C. was placed in a new foster home. Ms. Young-Sugar said P.C. was anxious and confused after this latest move to a new foster home. She testified that P.C. exhibited some symptoms of separation anxiety. She also testified she believed it was in P.C.'s best interest not to be returned to her parents because "[i]t would be difficult for her to work through the issues of sexual abuse in the presence of two people who are saying it didn't happen and she's saying it did happen." She felt that any contact at all with her parents "would be detrimental to her mental health." She did say, however, that P.C. misses her parents and expresses a desire to see them and live with them.
After this disposition hearing, the trial court made, inter alia, the following findings of fact:
7. That [P.C.] has expressed concerns to her therapist, Kathy Young-Sugar that her parents do not believe her disclosures of sex abuse that they are not supportive of her in these disclosures and they continue to deny the disclosures.
. . .
10. The parents have attended a parenting preview at Catawba County Parenting network and have signed up for "Active Christian Parenting Now" a six session course to be held in August and September, 2003 and are signed up for a Strengthening course, which will last 16 weeks.
11. That according to the testing and evaluations prepared by Dr. Cappelletty, both parents are capable of providing care and supervision for [P.C.]. Dr. Cappelletty noted significant issues in that neither parent acknowledged [P.C.'s] problems; they do not accept any responsibility for contributing to her problems; that neither parent believes [P.C.] needs the specialized care she is getting, and in fact, both parents are strongly biased against the treatment [P.C.] is receiving; they expressed no understanding of [P.C.'s] needs; expressed no empathy for [P.C.]; and did not show the ability to support the long term treatment which has been provided by the treatment team professionals.
12. That the parents have said to the Court that they are willing to modify behaviors to pursue reunification. There has been no demonstration of this commitment as evidenced by all of the evidence up to today and their statements to Dr. Cappelletty.
The trial court concluded as a matter of law that the Catawba County Department of Social Services had made reasonable efforts to prevent removal of P.C. from her home, but that removal was in P.C.'s best interest and it continued to be necessary to protect P.C.'s safety, health, and well-being. Therefore, the court continued custody of P.C. with DSS. The court ordered a brief attempt at reunification with the parents and P.C. but set up a concurrent process of adoption. The parents were ordered to participate in therapy, and visitation was not allowed between P.C. and her parents or any members of her family until such time as recommended by the treatment professionals and approved by the court.
From these factual and legal conclusions and the adjudication of neglect, respondent parents appeal.
The primary issue presented by this appeal is whether there was clear and convincing evidence to support the trial court's findings and conclusion that respondent-appellant parents neglected P.C. by not responding to her needs as a sexually abused juvenile. N.C. Gen. Stat. § 7B-101(15) defines a neglected juvenile, in pertinent part, as:
A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare. . ."
N.C. Gen. Stat. § 7B-101(15) (2003). When reviewing an adjudication of neglect, appellate review is limited to whether the trial court's findings of fact are supported by clear and convincing evidence and whether the trial court's conclusions of law are supported by those findings of fact. In re Gleisner, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000). Even if there is some evidence to support contrary findings, the trial court's findings of fact are considered conclusive if they are supported by clear and convincing evidence. In re Helms, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997).
The trial court made several findings of fact which we examine to determine if they are supported by clear and convincing evidence. If those factual findings are supported by the evidence, we then examine whether they support the legal determination that P.C. was neglected by her parents as defined by N.C. Gen. Stat. § 7B-101(15). The trial court found that P.C. "exhibits highly sexualized behaviors at home and in public, and she expresses knowledge of sexual activities that would not be expected from a four/five year old child." Although P.C. made many inconsistent statements regarding sexual activity with her father, her statements nevertheless indicated a sexual knowledge beyond her years. She described her father putting a "magic tube" inside her "pee-pee" or "kitty;" she said that another child at daycare put his finger in her "kitty;" she described a motorized tube making a circular motion inside her vagina; she said it tickled when put inside her when it was turned on; and she described touching and putting her mouth on her father's penis. These statements are clear and convincing evidence that P.C. has been prematurely sexualized.
One might reasonably expect that P.C.'s statements would cause her parents grave concern that she had been exposed to sexual activity. The trial court found, however, that respondents failed to recognize the seriousness of their daughter's sexualized behavior. There was also clear and convincing evidence to support this finding. The evidence tended to show that P.C.'s parents refuse to believe that she has been sexualized or that her statements demonstrate inappropriate knowledge for a preschool child. Several professionals, including Dr. Powell, Dr. Cappelletty, and Mrs. Young-Sugar agree that P.C. has been sexualized by someone. Dr. Gould, in his critique of Dr. Powell's report, does not reach this conclusion. Though Dr. Gould had never interviewed or treated P.C., the parents prefer to base their beliefs on his statements rather than the findings of professionals who have interviewed her numerous times over the period of a year. Because they do not believe that P.C. demonstrates premature sexual behavior, they do not want her in sexual abuse therapy and have stated they would take her out of such therapy if they could. Thus, there is clear and convincing evidence to support the trial court's finding that "[r]espondent parents have not been willing or able to recognize the significant nature of their daughter's sexualized behaviors, nor have respondent parents appropriately addressed those issues."
The trial court's findings of fact support an adjudication of neglect. For an adjudication of neglect, North Carolina courts have additionally "required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide `proper care, supervision, or discipline.'" In re Stumbo, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003) (quoting In re Safriet, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993)). Respondents' failure to recognize their daughter's problems and the gravity of those problems, their lack of support for the treatment their daughter needs, and their stated intent to remove her from such treatment show a substantial risk of future impairment of P.C. if she is removed from her current therapy and returned to her parents' home. Ms. Young-Sugar testified that "it would be difficult for [P.C.] to work through the issues of sexual abuse in the presence of two people who are saying it didn't happen," and that any contact at all with her parents would be "detrimental to her mental health." Dr. Cappelletty's "greatest concern" if P.C. were to be returned home was that neither parent would be able to protect her from future abuse because they would not believe her allegations. Also, because the parents do not see P.C.'s sexualized behaviors as problematic, they would not seek to stop those behaviors. The evidence supports the finding that the parents will not provide P.C. the kind of supporting environment she needs as a victim of sexual abuse. The trial court's conclusions that P.C. would not receive "proper care or supervision" in the home of her parents and that their home would be an environment "injurious to [her] welfare" are supported by its findings of fact. We affirm the trial court's adjudication of neglect. The disposition order was not assigned error on appeal, and it is therefore affirmed.
Appellants also assign error to the incomplete transcripts of the trial hearings. The hearings were tape-recorded and transcribed at a later date, and the transcriber did not understand every word on the tapes. The transcripts, therefore, contain a number of omitted words and phrases. The North Carolina Supreme Court has granted a new trial where "both the State and the defendant concede that `the transcription of the entire trial appears to be incomplete and, at places, simply inaccurate.'" State v. Sanders, 312 N.C. 318, 319, 321 S.E.2d 836, 837 (1984). The Court in Sanders could not "make any reasonable sense" of the challenged jury instructions on appeal. Id. at 318, 321 S.E.2d at 836. Here, however, the transcripts are substantially complete. Some unintelligible words and phrases interspersed throughout the transcript do not make it "altogether inaccurate and inadequate." State v. Robinson, 327 N.C. 346, 360, 395 S.E.2d 402, 410 (1990). The transcripts provide the reader with a thorough picture of the issues presented and the substance of testimony at trial. Because an adequate record of what transpired at trial has been reconstructed, this assignment of error is overruled.
Appellants also assign as error that P.C.'s statements to the Child Mental Health Examination Provider should have been excluded as hearsay and the product of improper, leading questions. The assignment of error is confined to the testimony of Dr. Powell, a licensed psychologist who conducted the Child Mental Health Examination.
According to the North Carolina Code of Evidence, Rule 703:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible into evidence.
N.C. Gen. Stat. § 8C-1, Rule 703 (2003). Under this rule, an expert may use out-of-court communications as the basis of an opinion and recount those communications to the trial court. State v. Jones, 322 N.C. 406, 410, 368 S.E.2d 844, 846 (1988) (citing In re Wheeler, 87 N.C. App. 189, 197, 360 S.E.2d 458, 463 (1987)(an expert could testify to out-of-court statements made by a child because the statements did not go to whether actual abuse occurred but to whether the child would be a good candidate for adoption)). Our Supreme Court has held that "testimony as to matters offered to show the basis for a physician's opinion and not for the truth of the matters testified to is not hearsay." Jones, 322 N.C. at 412, 368 S.E.2d at 847 (quoting State v. Wood, 306 N.C. 510, 516-17, 294 S.E.2d 310, 313 (1982)). P.C.'s statements to Dr. Powell are not offered to show that her father actually abused her. Rather, the statements form the basis for Dr. Powell's opinion that P.C. has been prematurely sexualized. The trial court did not find the parents had sexually abused P.C. but found their failure to recognize and treat her sexualization constituted neglect. Therefore, P.C.'s statements do not go to the truth of the matter asserted, which is that actual abuse occurred, but instead are used as (1) the basis of an expert opinion and (2) to show her premature sexualization. Therefore, the statements to Dr. Powell are not inadmissible hearsay.
Although appellants assign error to Dr. Powell's "leading" questions, they make no argument as such in their briefs, therefore this assignment of error is deemed abandoned. N.C. R. App. P. 28(b)(6) (2004).
The orders from which respondents appeal are affirmed.
Affirmed.
Judges McCULLOUGH and STEELMAN concur.
Report per Rule 30(e).